**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| IRISH INTERNATIONAL IMMIGRANT CENTER, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. _____ |
| v. | ) ) ) | |
| KENNETH THOMAS CUCCINELLI II, Acting Director, U.S. Citizenship & Immigration Services, LORI PIETROPAOLI, Regional Director, Northeast Region U.S. Citizenship & Immigration Services MICHAEL J. McCLEARY, Director, Boston Field Office, U.S. Citizenship & Immigration Services, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KEVIN K. McALEENAN, Acting Secretary, Department of Homeland Security, DEPARTMENT OF HOMELAND SECURITY, DONALD J. TRUMP, President of the United States, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**COMPLAINT**

## INTRODUCTION

1.     This lawsuit challenges the Trump Administration's abrupt termination of a longstanding government program that protects seriously ill people from deportation and death. The Administration's action is unconscionable. It is also illegal.

2.     For decades, the United States Customs and Immigration Services ("USCIS") has operated a small but vital humanitarian program that allows immigrant families battling serious illnesses to request immigration relief in the form of "deferred action." The program recognizes that deporting seriously ill individuals and their families is in many cases tantamount to a death sentence. Deferred action does not grant immigration status to beneficiaries; it confers other benefits, including an opportunity to apply for work authorization, the tolling of any accrual of "unlawful presence" that could bar future entry into the United States, and a measure of protection against removal proceedings by U.S. Immigration and Customs Enforcement ("ICE"). Those protected by this program are in dire straits. They include the mother of a U.S. citizen baby that has spent eight of the last ten months in the hospital; a ten-year-old girl with eye cancer; and a partially-immobilized 18-year-old boy with burns over 70% of his body.

3.     In August 2019, the Trump Administration abruptly prohibited USCIS field offices from granting deferred action in cases of serious medical need, and has now put the lives of scores of medically fragile individuals at immense and immediate risk. In doing so, the Administration provided no opportunity for notice-and-comment, or any other procedural protection that is required under the Administrative Procedures Act ("APA"). Nor did the Administration provide any rationale for its abrupt termination of the program, as required by law.

4. But the reasons for the Administration's actions are all too clear: they are part of an overarching anti-immigrant agenda that is driven by racial and ethnic animus, and in this case additional animus against persons with disabilities. Throughout his campaign and presidency, Defendant Trump has derided and stoked animus against immigrants of color. Defendant Kenneth Cuccinelli, Acting Director of USCIS has similarly described undocumented immigrants as invaders and recently claimed, just days before USCIS began sending denial letters to people seeking deferred action, that the Statue of Liberty's famous exhortation to "give me your tired, your poor" refers to "people coming from Europe . . . ."

5. Plaintiff Irish International Immigrant Center, Inc. (the "IIIC") is a nonprofit organization based in Boston, Massachusetts that serves clients in Massachusetts who seek deferred action based on a serious medical need. At present, the IIIC represents individuals and families in 19 such cases, including children seeking treatment for illnesses such as cancer, cerebral palsy, and muscular dystrophy—and the parents who care for them. Nearly all of the IIIC's deferred action clients are people of color from countries in the Caribbean, Central and South America, and Africa.

6. The elimination of USCIS's deferred action program has harmed the IIIC and endangered its clients. Deferred action benefits non-citizens with serious illness, their families, and the families of U.S. citizen children with serious illness. Without deferred action, the IIIC's clients face the prospect of returning to countries where their life-preserving care cannot be continued, or being placed in removal proceedings. Many of the IIIC's clients have been forced to contemplate the possibility of leaving behind minor children in the United States so that they can continue receiving essential care. USCIS's decision has also wreaked havoc for the IIIC. The organization has not only dropped almost all other work in an effort to help save the lives of its

3

clients and their family members, but it will now be tasked with the years-long commitment of representing these clients in complex immigration proceedings that will necessarily come at the expense of the IIIC's other work, all while losing funding tied to work that it can no longer take on.

7.     Because eliminating the authority of USCIS field offices to grant deferred action to individuals with dire medical needs is arbitrary, capricious, and based on impermissible animus, it violates the APA and the Equal Protection guarantees of the U.S. Constitution. The IIIC therefore asks this Court to declare the termination of USCIS's deferred-action program unlawful and enjoin its enforcement.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9.     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. §§ 702-06, and the Court's inherent equitable powers.

10.     Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(e)(1).

## PARTIES

11.     Plaintiff Irish International Immigrant Center, Inc. is a nonprofit organization based in Boston, Massachusetts.  Founded by Irish immigrants in 1989, the IIIC provides services for 3,500 immigrants and refugees from more than 120 countries every year. The IIIC empowers newcomers with legal and other services so they can reach stability, contribute to their communities, and flourish. As part of this work, the IIIC helps immigrant families with life-

threatening illnesses apply for and secure deferred action status from USCIS.  *See generally* Exhibit 1, Declaration of Anthony Marino.

12.     Defendant Kenneth Thomas Cuccinelli II is sued in his official capacity as Acting Director of USCIS, a federal agency that is part of the Department of Homeland Security ("DHS"). As Acting Director, Mr. Cuccinelli is responsible for overseeing USCIS's work, including its adjudication and policies regarding applications for deferred action and other immigration benefits.

13.     Defendant Lori Pietropaolo is sued in her official capacity as Regional Director of USCIS's Northeast District, which includes the Boston field office. In that capacity, Ms. Pietropaolo oversees the work of local USCIS Field Offices and, on information and belief, makes decisions regarding deferred action in cases involving serious illness.

14.     Defendant Michael J. McCleary is sued in his official capacity as Director of the USCIS Boston field office. In that capacity, Mr. McCleary oversees the work of the Boston field office and, on information and belief, helps to make decisions regarding deferred action.

15.     U.S. Citizenship and Immigration Services is an agency within the Department of Homeland Security that administers immigration benefits, including adjudicating requests for deferred action based on serious illness.

16.     Defendant Kevin McAleenan is sued in his official capacity as Acting Secretary of the Department of Homeland Security. As DHS Acting Secretary, Mr. McAleenan is responsible for the administration and enforcement of the immigration laws of the United States.

17.     The Department of Homeland Security is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws.

18.     Donald J. Trump is sued in his official capacity as the President of the United

States. He is ultimately responsible for the policies of all federal agencies, including DHS.

## BACKGROUND

I.     **USCIS Has Long Provided Deferred Action for Families Dependent on Critical Medical Treatment in the United States.**

19.     For decades, the U.S. Immigration and Naturalization Service ("INS"), followed

by USCIS, has used deferred action to provide relief to individuals whose cases raise compelling

humanitarian concerns and to individuals whose removal is not in the best interests of the U.S.

government.[1] Government regulations characterize deferred action as "an act of administrative

convenience to the government which gives some cases lower priority." 8 C.F.R.

§ 274a.12(c)(14).

20.     INS and USCIS have for decades granted deferred action to noncitizens who are

receiving treatment in the United States for serious medical conditions, and their immediate

family members. For example, deferred action has been available to non-citizens who are

themselves receiving medical treatment in the United States, and their immediate family

members. USCIS also recognizes that someone may seek deferred action on their behalf or "for

his/her entire family unit."[2] For example, the noncitizen parents or guardians of a U.S. citizen

---

[1] Citizenship & Immigration Servs. Ombudsman, Dep't of Homeland Sec., *Deferred Action: Recommendations to Improve Transparency and Consistency in the USCIS Process* 1-2 (July 11, 2011), https://www.dhs.gov/xlibrary/assets/cisomb-combined-dar.pdf (citing INS Commissioner Doris Meissner, *Exercising Prosecutorial Discretion*, HQOPP 50/4 (Nov. 17, 2000) ("Meissner Mem.")).

[2] U.S. Citizenship & Immigration Servs., *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* 3 n.1 (Mar. 7, 2012) ("*USCIS Standard Operating Procedures*").

child with a serious medical illness might seek deferred action so that child can receive treatment in the United States.

21.     Recipients of deferred action can remain temporarily in the United States, receiving a measure of protection from being placed in removal proceedings during the period of the deferred action—usually two years. Additionally, they are eligible to apply for work authorization, under 8 C.F.R. § 274a.12(c)(14), and they do not accrue unlawful presence under 8 U.S.C. § 1182(a)(9)(B)(i), which could otherwise foreclose future immigration benefits. Recipients of deferred action are also eligible to receive certain benefits, including Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses or unemployment insurance.[3] Deferred action thus provides stability and comfort to those benefiting from the program while they or a loved one undergoes serious and sometimes life-saving medical treatment.

22.     Upon creation of the DHS in 2003, the power to grant deferred action was formally delegated to USCIS, as well as ICE and U.S. Customs and Border Protection ("CBP").[4]

23.     On information and belief, deferred action requests made by individuals and families receiving treatment for serious illness are governed by USCIS's 2012 "Standard

---

[3] *See, e.g.*, 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d).

[4] Homeland Security Act of 2002, Pub. L. No. 107-296, § 442(c), 116 Stat. 2135, 2194 (2002); Dep't of Homeland Sec. Secretary Tom Ridge, *Delegation to the Bureau of Citizenship and Immigration Services* (June 5, 2003) (delegating authority to grant voluntary departure under section 240B of the INA, 8 U.S.C. §1229c, and deferred action); *see also* U.S. Dep't of Justice, *Immigration & Naturalization Service Fact Sheet: Prosecutorial Discretion Guidelines* (Nov. 28, 2000).

Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices," which apply to "all requests for deferred action . . . handled at USCIS Field Offices."[5]

24.     Applications to USCIS for deferred action based on medical need follow uniform procedures and involve individualized determinations. Applications are filed at local USCIS field offices. Each application is reviewed by a Field Office Director and/or District Director before a USCIS Regional Director makes a final determination on behalf of the field office.

25.     Applications must be signed by the applicants and are expected to include an explanation as to the basis for deferred action, including medical and other supporting documentation. USCIS recognizes that those requesting deferred action may provide extensive and sensitive "supporting documentation," including but not limited to proof of identity and nationality, biographic information, "medical information, evidence of community and familial ties and equities, conditions in the requestor's country of origin, etc."[6]  In the Boston field office, USCIS provided a checklist to potential filers explaining the requirements for deferred action applications, including a detailed letter from the treating physician.  *See* Exhibit 2, Declaration of Mahsa Khanbabai, ¶ 5 at Exhibit A.

26.     Applicants for deferred action are fingerprinted, and USCIS must complete a list of required background checks on those individuals before approving a request.[7]

27.     Applicants for deferred action may not have lawful immigration status.

---

[5] *USCIS Standard Operating Procedures* at 3.

[6] *Id.* at 3. Similarly, USCIS's notice template for granting deferred action requires recipients "to notify USCIS if [they] change [their] address" using a form that requires the recipients to disclose not only their names and addresses, but also their dates of birth, nations of origin, and alien registration numbers. *Id.* at 9 (citing Form AR-11).

[7] *Id.* at 4-6.

28.   Under its Standard Operating Procedures, USCIS also rejects applications for deferred action based on serious medical illness if the noncitizens are in removal proceedings or have final orders of removal.[8]

29.   USCIS field office decisions to grant deferred action in cases involving serious illness are distinct from decisions against issuing a Notice to Appear for removal proceedings.[9] Thus, when USCIS denies deferred action to individuals who are not already in removal proceedings, its "non-grant" template directs USCIS's field offices to state that "[d]enial of a request for deferred action does *not* necessarily mean that USCIS intends affirmatively to pursue your removal."[10] But when individuals are already in removal proceedings, USCIS's template directs its field offices to tell the individuals to "direct your request for deferred action to [ICE]."[11]

## II.   The Irish International Immigrant Center Represents Numerous Individuals Who Qualify for Deferred Action Due to Serious Medical Needs.

30.   USCIS has long recognized that a request for deferred action, including deferred action due to serious medical needs, may be made by "an attorney or representative."[12]

31.   The IIIC is a nonprofit that advocates for the rights of immigrants and provides legal and other services for noncitizens.

32.   The IIIC employs a staff of six attorneys and two program associates who provide immigration legal services.  The legal services provided by the IIIC include legal clinics serving

---

[8] *Id.* at 3-4, 12-13.

[9] *See* Meissner Mem..

[10] *USCIS Standard Operating Procedures* at 11 (emphasis added).

[11] *Id.* at 13.

[12] *Id.* at 3 n.1.

more than 2,000 individuals every year, forms assistance to more than 400 individuals per year in cases in which the IIIC does not enter an appearance, and direct representation of approximately 400 individuals at any given time who are filing applications for benefits before USCIS.

33.     Many of the IIIC's legal services are provided for a fee that is approximately 10% of that ordinarily charged by private attorneys for the same work.  For example, the IIIC currently charges $85 for an adjustment of status application for an asylee or refugee, and $350 for representation in a complex citizenship application.  Many of the IIIC's clients cannot pay these fees and, as a result, pay no fees at all.  The IIIC technically assigns a $500 fee for deferred action cases, but it generally does not collect any fees at all.  In one instance, a client contributed $100.  In all others, the IIIC waived its fees and collected nothing from the clients.

34.     The IIIC's legal services work aims to make legal advice and representation available to as many people as possible.  These services thus focus on providing free or low-cost representation to people who have affirmative avenues for seeking legal status, and making information and advice available to many others through thousands of free consultations provided at the IIIC's legal clinics every year.  Although the IIIC does sometimes represent clients who are detained and/or in removal proceedings, the IIIC's experience with these cases demonstrates that such matters can significantly monopolize the time of the attorneys involved and thus greatly diminish those attorneys' ability to take on other clients or provide legal consultations through the IIIC's clinics. Due to the large time commitments involved in these cases, the IIIC has not customarily taken on clients who are in removal proceedings.

35.     Among its other cases, the IIIC represents individuals and families applying for deferred action from USCIS as a result of a serious medical need.  These deferred action cases

have come to the IIIC in a variety of ways, including through its walk-in clinics, partnerships with area hospitals, and other referrals.

36.     More recently, in order to expand the IIIC's ability to meet the needs of hospital patients for deferred action and other legal services, the IIIC has developed more formalized partnerships with two local hospitals that provide specific financial support for this work.  These partnerships allow the IIIC to deliver legal services to critically ill patients, including consultations and representation for deferred action and other avenues of relief when available.

37.     This year the IIIC and its partners fundraised for its collaboration with area hospitals together, highlighting for prospective donors the critically ill patients that had been and could be helped by the IIIC to obtain deferred action.  These partnerships are in their early stages, but new funding through these two medical partnerships in 2019 have accounted for the cost of approximately one half of an attorney's salary.

38.     The 2019 funding allowed the IIIC to provide full representation to ten new clients who are patients at one of the two partner hospitals, including three who were seeking deferred action based on a serious medical need.

39.     All told, the IIIC currently represents 19 individuals and families who have or are in the process of applying for or seeking to renew deferred action based on a serious medical need.

40.     These families comprise 33 individuals, most of them people of color.

41.     Of these 19 deferred action cases, six involve Haitian families or individuals and four involve families from the Dominican Republic. Five cases involve families or individuals from Central and South American countries; three cases involve African families or individuals. The remaining client is a European national.

42.   The IIIC has filed a new applications for deferred action as recently as August 16, 2019, when it filed an application on behalf of a client with terminal breast cancer.

43.   The IIIC's 19 deferred action cases mostly involve families of children with serious medical illnesses for which treatment is unavailable in the countries in which they or their parents were born.

44.   Among these clients are:

- The mother of a six-month-old U.S. citizen who suffered a neonatal stroke.

- The mother of a ten-month-old U.S. citizen who has been hospitalized eight of those ten months with multiple complex diagnoses, including ambiguous genitalia, corneal clouding, and autoimmune interopathy.

- A six-year-old with multiple diagnoses who is undergoing testing, is confined to a wheelchair, and uses a feeding tube, and his mother.

- The parents of a six-year-old U.S. citizen with more than 20 complex diagnoses arising from premature birth, including developmental delays, chronic lung disease, pulmonary hypertension, and encephalopathy (damage or disease to the brain).

- A seven-year-old with a severe form of epilepsy involving multiple seizures a day and a risk of sudden death, and his mother and sibling.

- A ten-year-old blinded by eye cancer, and her mother.

- A 12-year-old with cerebral palsy who is confined to a wheelchair, suffers seizures, and is scheduled for major surgery later this month, and his parents.

- A 13-year-old with Duchenne's Muscular Dystrophy, and his mother.

- A 16-year-old with cystic fibrosis and his parents.

- An 18-year-old with burns over 70% of his body and immobilized arms and hands, who has been undergoing reconstructive surgery in order to clear scar tissue obstructing his mouth and ears, and his mother.

- A 24-year-old suffering complications from a bone marrow transplant performed to treat his leukemia, and his parents and minor sibling.

● An adult with incurable breast cancer.

45.     Before August 19, 2019, the IIIC represented nine of these individuals and families in applications for deferred action for which the IIIC had not yet received a response. These nine cases comprised two applications to renew deferred action and seven new applications.

46.     The IIIC was also preparing to file applications for three new families or individuals.

47.     The IIIC also represents seven individuals or families who have received deferred action that is set to expire in 2020. For example, in March 2020, deferred action will expire for the family of the seven-year-old boy whose epilepsy is so severe that it results in multiple seizures a day and a risk of sudden death.

**III.     USCIS Abruptly Terminated Deferred Action in Non-Military Cases.**

48.     On August 7, 2019, USCIS abruptly and without notice stopped its consideration of deferred action for non-military requestors.

49.     USCIS did not publicly announce its change in policy.

50.     Nor, on information and belief, did it provide a reason for the change.

51.     Around August 15, 2019, USCIS' Boston field office began sending denial letters to deferred action applicants.

52.     The IIIC, on behalf of its clients, received the first of these letters on August 19, 2019, from the USCIS Boston Field Office Director. Denial of applications for six additional clients followed, all of which were dated between August 15 and 22, 2019.  True and correct copies of three of these letters with identifying information redacted are attached to Exhibit 1, the Declaration of Anthony Marino, as Exhibits A-C.

53.     These letters—using language identical to letters sent around the country—informed noncitizens that deferred action had been denied because USCIS field offices "no longer consider deferred action requests" in non-military cases.

54.     The letters further notified families that, because their presence in the United States at the time they applied for deferred action was unlawful—a requirement for applying—they are now "not authorized to remain the United States."

55.     The letters did not mention any alternative means of applying for deferred action.

56.     To the contrary, they threatened: "If you fail to depart the United States within 33 days of the date of this letter, USCIS may issue you a Notice to Appear and commence removal proceedings against you with the immigration court. This may result in your being removed from the United States and found ineligible for a future visa or other U.S. immigration benefit."

57.     USCIS ended its deferred action program so abruptly that, in one case, it withdrew a request for additional evidence that it had sent to one of the IIIC's clients only three weeks earlier—telling the family to "disregard this request as USCIS will no longer process your deferred action request."[13] In another case, where a family represented by the IIIC was scheduled for an interview that was to take place five days after the denial notice was sent out, USCIS informed them that "this interview is cancelled since USCIS will not process your deferred action request."[14]

---

[13] Ex. 1, Decl. of Anthony Marino, Ex. B.

[14] *Id.*, Ex. C.

58.     On August 26, 2019, USCIS told members of the press that "medical deferred action requests are now submitted to ICE for consideration,"[15] as opposed to USCIS, as had been previously done.

59.     Upon information and belief, ICE was not informed that USCIS would stop processing non-military deferred action requests, and on further information and belief, has no plans to take over the program. An ICE official stated, "ICE is not going to implement any sort of a program or procedure or policy to take over that function."[16]

60.     On information and belief, ICE does not process applications for deferred action for individuals who do not have final orders of removal. And every individual who was previously eligible to obtain deferred action from USCIS based on medical need was not in removal proceedings and did not have an order of removal.

61.     On September 2, 2019, after sustained public pressure, USCIS issued a press release stating that it was reopening "non-military deferred action cases that were pending on August 7." The release further made clear that the program has been otherwise terminated.

---

[15] Shannon Dooling, *After Receiving Denial Letters, Immigrants Fear End of Medical Deferral Program*, WBUR (Aug. 26, 2019), http://www.wbur.org/news/2019/08/26/medical-deferment-immigration-program-ended.

[16] Shannon Dooling, *Feds Can't Agree on Which Agency — If Any — Handles Medical Deportation Deferrals*, WBUR (Aug. 28, 2019), http://www.wbur.org/news/2019/08/28/ice-uscis-immigrants-medical-deferred-action.

**IV.   USCIS's Decision to Terminate Deferred Action Has Endangered the IIIC's Clients and Directly Harmed the IIIC.**

62.    The termination of deferred action has caused immeasurable agony, distress, heartbreak, confusion, and fear for the IIIC's clients.

63.    The IIIC's clients who had not received letters notifying them of the termination soon learned about the decision from their counsel at the IIIC, and from media reports.

64.    For many of the IIIC's clients, the termination of deferred action is life threatening, because they may no longer be able to receive care in the United States.

65.    For many of the IIIC's clients, who are the family members of U.S. citizen children, USCIS's decision raises untenable choices about whether to leave children alone in the United States to receive life-preserving care, or instead take them abroad to countries where their medical conditions might quickly kill them.

66.    Many of the IIIC's current or future clients would face substantial hindrances if they were to attempt to bring litigation to vindicate their own interests with respect to deferred action. For example, the IIIC's clients include children who cannot file suit on their own behalf, adults who are absorbed in important health care decisions and in the day-to-day needs of their children's treatment, and families who are terrified of public attention and of any real or perceived dispute with the federal government, from whom they, by definition, wish to secure relief. The IIIC's clients also include adults who are unable to communicate and/or are terminally ill.

67.    Meanwhile, the termination of deferred action has also had direct and substantial impacts for the IIIC itself.

68.    Since learning of it, the IIIC's limited staff has been almost entirely absorbed in counseling, supporting, and advocating for affected families, at the expense of all other work.

69.    IIIC staff attorneys have spent dozens of hours providing legal advice to affected individuals and families, helping them to attempt to absorb and understand the news and discussing options and possible future scenarios with them. They have had to discuss the impact of USCIS's decision with their clients' health care providers in order to explain the possible ramifications of the new policy in each case. And each time that new developments have arisen—including USCIS's contention that ICE would take over deferred action and USCIS' September 2, 2019 announcement that it would reopen certain cases—IIIC attorneys have had to explain these shifts to their clients, medical providers, and others.

70.    The IIIC also determined that it was necessary to launch a public campaign. It organized a press conference, worked closely with clients who chose to make their stories public, and communicated with public officials, lawyers, community groups, religious leaders, and reporters.

71.    By the week of August 26, 2019, the termination of deferred action was national news; the IIIC's Executive Director and Legal Director have been interviewed multiple times and quoted in dozens of media outlets.

72.    As a consequence of their time spent providing legal counsel to and advocating for and alongside its deferred action clients, IIIC attorneys have postponed non-urgent work on other cases, cancelled appointments, suspended the scheduling of cases in which the IIIC provides assistance with immigration forms, and stopped opening new full-representation cases.

73.    In addition to impairing the IIIC's ability to serve its mission of making low-cost legal services available to more people, the IIIC's inability to open new cases will immediately lead to hundreds of dollars of lost fee revenue associated with the full representation and form-assistance cases for which the IIIC charges a modest fee.

74.     USCIS's decision to terminate non-military deferred action will continue to harm the IIIC in the long term.

75.     First, without deferred action for people with serious medical conditions, the IIIC's continued representation of its deferred action clients and people who would be such clients—but for the termination of the program—will require substantial time commitments for years to come. This will come at a heavy cost to the IIIC's ability to take on other cases, harming both its mission and ability to collect fees.

76.     Many, if not all, of the IIIC's deferred action clients with serious medical conditions will be unable or unwilling to leave the life-preserving care that they or their children receive in the United States, and will face the risk of being placed in removal proceedings either immediately or after their deferred action status concludes. New prospective clients with serious medical illness will similarly face such risks. On information and belief, the IIIC's current and future clients will be able to seek deferred action status from ICE only if they go through removal proceedings and are ordered removed.

77.     Representing its deferred action clients in removal proceedings is a years-long commitment for the IIIC due to the significant expenditures of attorney time that each removal case will require. Although the IIIC will continue to represent its deferred action clients in removal proceedings if possible, that representation will come at a significant cost to the organization's ability to take larger numbers of other cases, with consequences both for its mission, the community it serves, and for its generation of fees.

78.     Second, the termination of non-military deferred action is likely to lead to a loss of funding for the IIIC, including but not limited funding it receives from hospitals.

79.     The IIIC has developed partnerships with hospitals, and receives funding that is a direct result of its ability to represent clients facing serious illness in seeking deferred action before USCIS. If the IIIC is no longer able to take on these cases because deferred action for people with serious medical conditions is unavailable, it is likely to lose some or all of the funding that it receives from hospitals.

## V.     USCIS's Decision Was Motived By Animus Based on Race and National Origin, and Disability.

80.     On information and belief, the defendants' decision to terminate USCIS's non-military deferred action program was a consequence of impermissible animus based on race, national origin, and disability.

81.     Many of the Trump Administration's immigration policies—from the decisions to render one million noncitizens unlawfully present,[17] to the calls for the elimination of "chain migration,"[18] to the policies obstructing citizenship for lawful permanent residents in the

---

[17]  Adam Adelman, *Trump Ends DACA Program, No New Applications Accepted*, NBC News (Sept. 5, 2017), https://www.nbcnews.com/politics/immigration/trump-dreamers-daca-immigration-announcement-n798686 (noting that termination of DACA affected as many as 800,000 "Dreamers"); Nick Miroff & David Nakamura, *200,000 Salvadorans May Be Forced to Leave the U.S. as Trump Ends Immigration Protection*, Wash. Post (Jan. 8, 2018), https://www.washingtonpost.com/world/national-security/trump-administration-to-end-provisional-residency-for-200000-salvadorans/2018/01/08/badfde90-f481-11e7-beb6-c8d48830c54d_story.html.

[18]  Julie Bykowicz & Rebecca Ballhaus, *Trump Revives Attack on Diversity Visa, "Chain Migration" in Speech*, Wall St. J. (Feb. 23, 2018), https://www.wsj.com/articles/trump-revives-attack-on-diversity-visa-chain-migration-in-speech-1519410081; Nick Miroff, *Family Ties Drive U.S. Immigration. Why Trump Wants to Break the "Chains*," Wash. Post. (Jan. 2, 2018), https://www.washingtonpost.com/world/national-security/how-chain-migration-became-a-target-in-trumps-immigration-agenda/2018/01/02/dd30e034-efdb-11e7-90ed-77167c6861f2_story.html ("Attorney General Jeff Sessions, Homeland Security Secretary Kirstjen Nielsen and other Trump Cabinet members have also hammered at 'chain migration' in recent weeks, calling it a threat to American workers and national security.").

military[19]—can hardly be understood as means of protecting national security or controlling illegal immigration.  Instead, on information and belief, the Trump administration's immigration policies reflect a consistent desire to drive out immigrants of color and prevent non-white people from living in America or becoming American citizens.[20]

82.     President Trump's statements provide ample evidence of this animus.  He has asked why the United States could not have more immigrants from Norway, a predominantly white country.[21]  While campaigning, he labeled Mexican immigrants as criminals and rapists[22]; as President, he has expressed a desire to reduce immigration from "shithole" countries such as Haiti, El Salvador, and African nations.[23] President Trump declined to criticize white nationalist demonstrators,[24] told four American Congresswomen of color to "go back" to the countries they

---

[19]  Jim Garamone, *DoD Announces Policies Affecting Foreign Nationals Entering Military*, U.S. Dep't of Def. (Oct. 13, 2017), https://www.defense.gov/News/Article/Article /1342430/dod-announces-policies-affecting-foreign-nationals-entering-military/.

[20] *See generally* Jayashri Srikantiah & Shirin Sinnar, *White Nationalism as Immigration Policy*, Stan. L. Rev. (Mar. 2019), https://www.stanfordlawreview.org/online/white-nationalism-as-immigration-policy/.

[21]  Henrik Pryser Libell & Catherine Porter, *From Norway to Haiti, Trump's Comments Stir Fresh Outrage*, N.Y. Times (Jan. 11, 2018), http://www.nytimes.com/2018/01/11/world/trump -countries-haiti-africa.html.

[22]  Katie Reilly, *Here Are All the Times Donald Trump Insulted Mexico*, Time (Aug. 31, 2016), http://www.time.com/4473972/donald-trump-mexico-meeting-insult/.

[23]  Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, Wash. Post. (Jan. 12, 2018), http://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7 -91af-31ac729add94_story.html; Julie Hirschfeld Davis *et al.*, *Trump Alarms Lawmakers with Disparaging Words for Haiti and Africa*, N.Y. Times (Jan. 11, 2018), http://www.nytimes.com /2018/01/11/us/politics/trump-shithole-countries.html.

[24]  Glenn Thrush & Maggie Haberman, *Trump Is Criticized for Not Calling Out White Supremacists*, N.Y. Times (Aug. 12, 2017), http://www.nytimes.com/2017/08/12/us/trump -charlottesville-protest-nationalist-riot.html.

came from,[25] and pardoned an Arizona sheriff convicted of contempt of a judicial order requiring

that he cease racially profiling Latinos, calling the sheriff an "American patriot."[26]

83.     President Trump has also specifically directed animus based on medical disability

against non-white foreign nationals. He has falsely said that Haitians "all have AIDS."[27] He has

falsely claimed that immigrants crossing the southern border into the U.S. bring "large scale

crime and *disease*."[28]

84.     Consistent with these various and overlapping forms of animus, in June 2019

Mr. Cuccinelli was named as USCIS's Acting Director.

85.     Mr. Cuccinelli's actions and statements concerning immigration provide further

evidence of animus. He was a founding member of a group of state legislators that, in 2007,

---

[25] Mike DeBonis, *et al.*, *A Divided House Votes for Resolution Condemning Trump's Racist Remarks*, Wash. Post (July 17, 2019), http://www.washingtonpost.com/politics/trump-lashes-out-again-at-minority-lawmakers-as-house-prepares-to-condemn-his-racist-tweets/2019/07/16/bca3afa4-a7b3-11e9-a3a6-ab670962db05_story.html.

[26] Julie Hirschfeld Davis & Maggie Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration*, N.Y. Times (Aug. 25, 2017), http://www.nytimes.com/2017/08/25/us/politics/joe-arpaio-trump-pardon-sheriff-arizona.html.

[27]  Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.

[28] Donald J. Trump (@realdonaldtrump), Twitter (Dec. 11, 2018, 7:12 AM), https://twitter.com/realDonaldTrump/status/1072464107784323072?s=20 (emphasis added); *see also* Donald J. Trump (@realdonaldtrump), Twitter (July 6, 2015, 9:25 PM), https://twitter.com/realDonaldTrump/status/618229195181826049?s=20 ("In addition to the criminals among the illegal aliens what about all the infectious diseases they brought to US"); Donald J. Trump (@realdonaldtrump), Twitter (Aug. 5, 2014, 8:55 AM) https://twitter.com/realDonaldTrump/status/496640747379388416?s=20 ("Our government now imports illegal immigrants and deadly diseases."); Donald J. Trump (@realdonaldtrump), Twitter (Aug. 4, 2014, 7:51 PM), https://twitter.com/realDonaldTrump/status/496443427647942658?s=20 ("The bigger problem with Ebola is all of the people coming into the U.S. from West Africa who may be infected with the disease. STOP FLIGHTS!").

described undocumented people as "foreign invaders" responsible for, among other things, "serious infectious diseases."[29] Since then, Mr. Cuccinelli has repeatedly accused immigrants of invading the United States.[30]

86.     In August 2019, in his capacity as USCIS's Acting Director, Mr. Cuccinelli made public statements defending a new "public charge" rule published by DHS on August 14, 2019. The new rule expands the factors that USCIS will consider when deeming someone ineligible for admission or adjustment of status based on a perceived likelihood that they will become a "public charge."

87.     In his public statements, Mr. Cuccinelli defended the new public charge rule along lines of race and national origin. Specifically, while acknowledging that America had in prior generations welcomed people lacking financial means, Mr. Cuccinelli argued that those were "people coming from Europe, where they had class-based societies" and that today's immigrants must be able to take care of themselves.[31]

88.     Days after making these statements, USCIS mailed letters informing the IIIC's clients, and countless others, that their requests for deferred action were denied because USCIS had eliminated its deferred action program.

---

[29] Andrew Kaczynski, *Trump Official Has Talked About Undocumented Immigrants as "Invaders" Since at Least 2007*, CNN (Aug. 17, 2019), https://www.cnn.com/2019/08/17/politics/kfile-ken-cuccinelli-immigration-invasion-rhetoric/index.html.

[30] *Id.*

[31] Colby Itkowitz and Felicia Sonmez, *'Who Can Stand on Their Own Two Feet': Ken Cuccinelli Edits Famous Statue of Liberty Poem*, Wash. Post (Aug. 13, 2019), at https://beta.washingtonpost.com/politics/who-can-stand-on-their-own-two-feet-ken-cuccinelli-edits-famous-statue-of-liberty-poem/2019/08/13/4cdddf62-bdcc-11e9-a5c6-1e74f7ec4a93_story.html.

## COUNT 1 – ADMINISTRATIVE PROCEDURE ACT
**(Agency Action that is Arbitrary, Capricious, Not in Accordance with the Law, Without Observance of Procedure Required By Law, and Discriminatory)**

89.     The foregoing allegations are re-alleged and incorporated herein.

90.     USCIS, which is overseen by Defendants, is a federal agency whose final actions are subject to judicial review under the Administrative Procedure Act.  5 U.S.C. § 551(1).

91.     Under the Administrative Procedures Act, a reviewing court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

92.     The APA also requires that agency action that is substantive in nature follow notice-and-comment procedures. 5 U.S.C. §§ 553, 706(2)(D).

93.     Defendants' termination of USCIS's non-military deferred action authority eliminates authority that has been acknowledged for decades, without a reasoned basis, and is arbitrary and capricious in violation of the APA.

94.     Although USCIS's deferred action authority was developed through decades of practice, not through regulation, it has been acknowledged and ratified by regulation and statute. The defendants' termination of USCIS's authority to grant deferred action in non-military cases binds USCIS field offices to categorically deny all requests for deferred action based on serious medical need. It is thus a substantive rule requiring notice-and-comment.

95.     The defendants' termination of USCIS's deferred action program is also based on impermissible animus, which is contrary to law.

96.     The termination of USCIS's authority to grant deferred action in non-military cases thus violates the APA.

## COUNT 2 – THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION
### (Animus based on race, national origin, and disability)

97.     The foregoing allegations are re-alleged and incorporated herein.

98.     Plaintiff has a right under the Fifth Amendment to the U.S. Constitution to equal protection of the laws.

99.     On information and belief, the defendants' termination of deferred action was impermissibly motivated by racial animus and animus based on national origin, in violation of the Equal Protection Clause. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-266 (1977).

100.    On information and belief, the defendants' termination of deferred action was impermissibly motivated by animus against persons with disabilities, and cannot survive even rational basis review. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).

## REQUEST FOR RELIEF

Wherefore, the Irish International Immigrant Center respectfully requests that this Court:

1.     Vacate and set aside the defendants' termination of USCIS field offices' authority to grant deferred action in non-military cases, as well as any action taken by the defendants to effect that termination;

2.     Declare that all actions taken by the defendants to terminate USCIS field offices' authority to grant deferred action in non-military cases are void and without legal force or effect;

3.     Declare that all actions taken by the defendants to terminate USCIS field offices' authority to grant deferred action in non-military cases are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 702-706;

4.      Declare that all actions taken by the defendants to terminate USCIS field offices' authority to grant deferred action in non-military cases are in violation of the Constitution;

5.      Preliminarily and permanently enjoin the defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the termination of USCIS's non-military deferred action program, and from taking any other action to terminate that program that is not in compliance with applicable law; and

6.      Grant any further relief this Court deems just and proper.

Dated: September 4, 2019

Respectfully submitted,

IRISH INTERNATIONAL IMMIGRANT CENTER,

By its attorneys,

Matthew R. Segal (BBO 654489)
Adriana Lafaille (BBO 680210)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
211 Congress Street
Boston, MA 02110
Tel.:  617.482.3170
msegal@aclum.org
alafaille@aclum.org

Oren Nimni (BBO 691821) Lawyers
for Civil Rights
61 Batterymarch Street
Boston, MA 02110
Tel.: 617.988.0606
onimni@lawyersforcivilrights.org

Anthony M. Marino (BBO 680237)
(application for admission pending)
Irish International Immigrant Center
1 State Street, Suite 800
Boston, MA 02109
Tel.: 617.542.7654
amarino@iiicenter.org

*/s/*  Robert D. Carroll
Robert D. Carroll (BBO 662736)
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000

Ira J. Levy (*Pro hac vice* forthcoming)
Goodwin Procter LLP
The New York Times Building
620 Eight Avenue
New York, NY 10018
Tel.:  212.813.8800
ILevy@goodwinlaw.com

Rachel M. Walsh (*Pro hac vice* forthcoming)
Goodwin Procter LLP
Three Embarcadero Center, 28th Floor
San Francisco, California  94111
Tel.: 415.733.6128
rwalsh@goodwinlaw.com

*Attorneys for Plaintiff the Irish International
Immigrant Center*