

This document is being prepared for the exclusive use of ████████ at U.S. DEPARTMENT OF HOMELAND SECURITY

# House Oversight and Reform Committee, Civil Rights and Civil Liberties Subcommittee hearing on The Administr..,sked FINAL

October 30, 2019 9:53PM ET

TRANSCRIPT

October 30, 2019

COMMITTEE HEARING

REP. JAMIE RASKIN, D-MD.

HOUSE OVERSIGHT AND REFORM COMMITTEE, CIVIL RIGHTS AND CIVIL

LIBERTIES SUBCOMMITTEE HEARING ON THE ADMINISTRATION'S DECISION TO

DEPORT CRITICALLY ILL CHILDREN AND THEIR FAMILIES

Bloomberg Government

Support: 1-877-498-3587

www.bgov.com

Copyright 2019. Provided under license from Bloomberg Government.

All materials herein are protected by United States copyright law

and/or license from Bloomberg Government, and may not be

reproduced, distributed, transmitted, displayed, published or

broadcast without the prior written permission of

Bloomberg Government.

You may not alter or remove any trademark, copyright or other

notice from copies of the content.

HOUSE OVERSIGHT AND REFORM COMMITTEE, CIVIL RIGHTS AND CIVIL

LIBERTIES SUBCOMMITTEE HEARING ON THE ADMINISTRATION'S DECISION

TO DEPORT CRITICALLY ILL CHILDREN AND THEIR FAMILIES

OCTOBER 30, 2019

SPEAKERS:

REP. JAMIE RASKIN, D-MD., CHAIRMAN



EXHIBIT
B

**Bloomberg**
**GOVERNMENT**

This document is being prepared for the exclusive use of ██████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

REP. WILLIAM LACY CLAY, D-MO.

REP. CAROLYN B. MALONEY, D-N.Y.

REP. DEBBIE WASSERMAN SCHULTZ, D-FLA.

REP. JIMMY GOMEZ, D-CALIF.

REP. ROBIN KELLY, D-ILL.

REP. ALEXANDRIA OCASIO-CORTEZ, D-N.Y.

REP. AYANNA PRESSLEY, D-MASS.

DEL. ELEANOR HOLMES NORTON, D-D.C.

REP. CHIP ROY, R-TEXAS, RANKING MEMBER

REP. THOMAS MASSIE, R-KY.

REP. MICHAEL CLOUD, R-TEXAS

REP. JODY B. HICE, R-GA.

REP. MARK MEADOWS, R-N.C.

REP. CAROL MILLER, R-W.V.

REP. JIM JORDAN, R-OHIO, EX OFFICIO

REP. FRED KELLER, R-PENN.

REP. HARLEY ROUDA, D-CALIF.

REP. JIM COOPER, D-TENN.

REP. MARK DESAULNIER, D-CALIF.

REP. GLENN GROTHMAN, R-WIS.

WITNESSES:

MR. KEN CUCCINELLI, ACTING DIRECTOR, U.S. CITIZENSHIP AND

IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY

MR. MATTHEW T. ALBENCE, ACTING DIRECTOR, U.S. IMMIGRATION AND

CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY

(CORRECTED COPY: ADDS TO SPEAKERS LIST)

RASKIN: Good morning, everyone. Thank you all for joining us here today. The subcommittee will come to order.

Without objection, the chair is authorized to declare a recess of the committee at any time.

This document is being prepared for the exclusive use of ████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

Today's hearing will examine the administration's decision to deport children with critical illnesses, a decision that was recently reversed, following public outrage and pressure from this subcommittee.

I will now recognize myself for five minutes to give an opening statement, and then I will turn to the ranking member.

We are here to get to the bottom of the administration's mysterious campaign to deport critically ill children and their families. It appears that this policy has thankfully been reversed, after Congress and the American people rose up in an outcry at the cold inhumanity on display in this policy.

I am going to treat this hearing as not only in honor of the memory of our late beloved chairman, Elijah Cummings, but as a hearing in direct pursuit of a policy objective that was close to his heart.

RASKIN: The threatened deportation of sick children was such an outrage to Chairman Cummings that his very last official act, before his death, was to issue subpoenas to hold the administration to account. On Wednesday, in the waning hours of his life, through all of his pain and difficulty, Chairman Cummings recognized the indelible stain that this policy would leave on our nation and he made holding the government accountable his final official act. And we now have a sacred obligation to follow through on his subpoenas to make sure that we defend some of the most vulnerable people on the planet: sick children who have come as strangers to our lands to seek medical assistance.

So to our witnesses today, I want to be clear: This subcommittee intends to follow through on Chairman Cummings's promise to unearth the truth behind this policy and is -- desire to ensure that the policy's truly reversed and that our government treats people in this category with the dignity that they deserve. Not only to the -- do we owe that to our late beloved chairman, but we owe it to Maria Isabel Bueso, to Jonathan Sanchez, to Serena Badea and all of the immigrants whose health and whose lives were threatened by the policy implemented by USCIS.

USCIS must explain first what the current policy is on deferred action. It cannot keep the process shrouded in secrecy while these kids wait to hear their fate.

If we could go to the slide -- on September 18th, acting Secretary of Homeland Security Kevin McAleenan and ordered the acting director, Mr. Cuccinelli, who's with us here today, to, quote, "ensure that effective immediately, USCIS resumes its consideration of non-military deferred action request on a discretionary case-by-case basis." It is unclear whether USCIS has actually granted relief to anyone since reversing course. He further ordered USCIS to, quote, "ensure that the procedure for considering and responding to deferred action requests is consistent throughout USCIS, and that discretionary case-by-case deferred action is granted only based on compelling facts and circumstances."

© 2019 BGOV LLC All Rights Reserved

**Bloomberg**
**GOVERNMENT**

This document is being prepared for the exclusive use of ████████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

What exactly does this mean? What is the problem that USCIS is trying to fix? What changes are being considered? Will any outside stakeholder -- stakeholders be consulted? We want to have maximum transparency to ensure that USCIS is not imposing unreasonable requirements on immigrants who deserve our attention and our mercy.

In the meantime, USCIS should explain what will happen to people whose prior deferrals have expired while their renewals are still under review. We've heard from the family of a 12-year-old boy with an incurable condition that could cause him to bleed to death if he's not treated correctly. Both of his parents applied in March to renew their deferrals, but have been waiting for months without any decision at all. His father's deferral expired in August. His mother's deferral expires in January. Without a deferral, neither parent would be authorized to stay or work in the United States, threatening their ability to support and care for their sick son.

So what does USCIS recommend families like his do while the agency is trying to decide how to reinstate deferred action? How many more people are stuck in this kind of limbo, and what will we do to protect them? We want basic answers to these questions, and we come here not in any kind of "gotcha" spirit. We just want to deal with a very serious problem that was brought to our committee.

The ongoing confusion regarding deferred action reflects the same kind of chaos that apparently produced this policy in the first place, and that prompted our last hearing and for which the administration, I hope, today will provide us answers. What little we've been able to learn about how this policy came to be indicates that it was undertaken in haste, without any effort to ascertain what its health- and life-threatening effects would be on the people affected.

RASKIN: At our hearing in September, we heard the compelling stories of people who were directly harmed by the policy: Isabel Bueso, a 24-year-old woman suffering from a rare disease, testified that deportation would be, quote, "a death sentence for me." She told us, "I want to live. I'm a human being with hopes and dreams in my life."

Jonathan Sanchez, a 16-year-old suffering from cystic fibrosis, which is a disease that affects people in my family. Jonathan Sanchez told us that, upon learning he was facing deportation, he broke down in tears, pleading, quote, "I do not want to die. I don't want to die. If I go back to Honduras now, I will die." In his words, quote, "It is incredibly unfair to kick out sick kids who are in the hospital or at home, taking treatments, and who are just trying to have better opportunities to live."

It's obvious from the testimony that USCIS either did not realize what the real-world implications of its policy would be, or it knew and decided to go ahead anyway. Either reality, I think, would be damning. But the effects on Maria and Jonathan would have been entirely foreseeable if USCIS has sought public feedback before instituting the new policy. According to USCIS, it failed to consult a single external stakeholder before jeopardizing these families.

This document is being prepared for the exclusive use of ███████ at U.S. DEPARTMENT OF HOMELAND SECURITY

Making matters worse, USCIS did not even issue any public announcement about the policy or provide any guidance to people in Maria and Jonathan's situation, or any of the critically ill children and their families about what would come next and what they should be doing.

Why not? What was the reason for the secrecy and the surprise? Is it USCIS' practice to implement massive policy shifts like this without providing public notice?

Sadly, the threatened deportation of sick kids is just one example of this administration's mistreatment of immigrant children. It is not the only one. USCIS in particular has engaged in a pattern of developing policies that endanger children.

Since, Mr. Cuccinelli, you took office, USCIS has eliminated automatic citizenship for some children of U.S. soldiers stationed overseas, introduced new barriers for immigrant kids fleeing domestic abuse in their home countries, and rolled out a public charge rule that has scared many parents into removing their children from essential health and nutrition services.

Each of these acts is an affront to the central tenet of Chairman Cummings' philosophy, that children are the living messengers that we send forward to a future that we ourselves will never see. The last hearing that Chairman Cummings attended was our September 11th hearing on this issue.

Treating children with dignity was so important to him that he made a point to come down from Baltimore, despite his advanced failing health. At that hearing, Elijah said, quote, "I really do think that we are in a moral situation. People are striving to live, they are trying to breathe the air of our country. They're trying to be better, they're trying to be healthy."

Chairman Cummings, who himself was striving to live at that moment, trying to be healthy, wanted these children to have the same access to medical treatment that he did. We will honor the chairman's memory and the humanity of all those seeking deferred action by remaining vigilant, conducting rigorous oversight and working to guarantee that this administration treats immigrants with the dignity that they deserve.

I welcome today's witnesses -- Mr. Cuccinelli, Mr. Albence -- we are delighted that you came today, but we want to make sure that we see no further bureaucratic stonewalling and confusion on these matters. We want clarity, we're here for answers and we will not stop until we get them. We thank you for coming.

And I'm now delighted to recognize the distinguished ranking member of our committee, Mr. Roy.

ROY: Thank you, Mr. Chairman.

Bloomberg GOVERNMENT

This document is being prepared for the exclusive use of ████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

We could fund ICE and Border Patrol properly. We could find ICE at the level that President Obama asked for, upwards of a billion dollars that he asked for to deal with the unaccompanied alien children that were coming in 2014 and 2015, and yet we only got $200 billion for ICE in June after demanding to get a supplemental vote, and that $200 billion was constrained in not being able to use.

This hearing today is about an issue that affects 900 people for whom we have great sympathy, and we ought to address the issue. But on an average day this year, that is three times less than the total number of crossing during one Border Patrol shift. Think about that: one Border Patrol shift. Today, CBP apprehends roughly 1,400 migrants a day. On an average day in May, that number was 5,000.

If the chairman wants to address the facts that these deferrals are not actual programs and are prosecutorial discretion, let's discuss that and figure out a system that will work, and that we can work together to try to figure that out, but I'd love to do that in the context of our very, very broken immigration system and border security.

Thank you, Mr. Chairman.

RASKIN: Mr. Roy, thank you for your very thoughtful remarks, and as always, I'm very eager to work with you and all of our colleagues on comprehensive immigration reform. But you correctly delineate what the object of today's hearing is, which is to focus on this question, and we're going to do it, and I think -- I'm hope -- very hopeful we'll get the answers that we need and we can move on to work on other stuff.

There are several members of the committee who have come today both out of their -- their interest in the subject, but also in a tribute to Chairman Cummings. So without objection, I would waive them on. Mr. Rouda, Mr. Cooper and Mr. DeSaulnier are members of the broader committee who are joining those of us on the subcommittee, including Ms. Kelly and Mr. Gomez who've arrived over here.

And also, thank you, Mr. Roy for telling us about Mr. Hice's father. I was not aware of that. Our prayers and our thoughts go out to him. It seems like we're just going to too many funerals these days, but we're -- we're sending him the strength and encouragement.

All right, with that, I want to formally welcome our witnesses today: Ken Cuccinelli, who's the acting director of the U.S. Citizenship and Immigration Services at the Homeland Security. Welcome, Mr. Cuccinelli; and Matthew Albence, who's the acting director of the U.S. Immigration and Customs Enforcement, ICE, at the U.S. Department of Homeland -- Homeland Security. If the witnesses would kindly rise and raise their right hands, I will begin by swearing you in.

Do you swear or affirm the testimony you're about to give is the truth, the whole truth and nothing but the truth, so help you God?

# Bloomberg
## GOVERNMENT

This document is being prepared for the exclusive use of ██████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

Then let the record show the witnesses have answered in the affirmative. Thank you. You may be seated. Please speak directly into microphones. Without objection, any written -- written statements you brought with you or that you decide to provide will be made part of our record.

And with that, Mr. Cuccinelli, you're now recognized to give an oral presentation of your testimony.

CUCCINELLI: Good morning, Chairman Raskin, Ranking Member Roy and distinguished members of the subcommittee.

First, I want to express my condolences on the passing of Chairman Cummings, and I appreciate his dedication to representing the people of Maryland's 7th District for 23 years.

My name is Ken Cuccinelli. I'm the acting director of the United States Citizenship and Immigration Services. USCIS administers the nation's lawful immigration system. The agency's mission is to safeguard the integrity and promise of that system by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland and honoring our values.

I can see -- I can tell you that I'm extremely proud of the work and professionalism I see every day by the employees at USCIS in service to America. In fiscal year 2019, just ended, USCIS achieved many of President Trump's goals to make our immigration system work better for America. As an agency, we've tirelessly worked hand-in-hand with our fellow DHS components to answer President Trump's call to address the ongoing crisis at our southern border.

We've taken significant steps to mitigate the loopholes in our asylum system, particularly in the absence of congressional action, combating fraudulent and frivolous claims and strengthening the protections we have in place to preserve humanitarian assistance for those truly eligible for it.

The workload USCIS faces each year is staggering. In fiscal year 2019, we adjudicated nearly seven and a half million requests for immigration benefits, a 14 percent over -- increase over the previous fiscal year, and that is with only a 2 percent increase in fee income, demonstrating improved cost-effectiveness even as we face many challenges.

CUCCINELLI: This workload represents the full spectrum of immigration benefits that our laws provide to those seeking to come to the United States, temporarily or permanently, and those who seek to become citizens of this nation. Last year, USCIS naturalized 833,000 new U.S. citizens, the most in more than a decade.

Deferred action is the exercise of discretion to defer removal action on a case-by-case basis against an alien for a certain period of time. Deferred action is not an immigration benefit or a specific form of relief, does not provide lawful immigration status and does not excuse any past or future periods of unlawful presence.

This document is being prepared for the exclusive use of ███████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

Importantly, deferred action can be terminated at any time at the agency's discretion. Historically, USCIS does not receive many nonmilitary, non-DACA deferred action requests. For the past few years, USCIS has received approximately a thousand such requests annually.

Some of these requests are for family support or medical issues. This has frequently been incorrectly reported or mischaracterized by the media and some in Congress as a medical deferred action program. To be clear, DHS does not and has never administered a medical deferred action program. Only Congress can provide permanent immigration relief to an entire class of aliens.

Deferred action is a practice in which the secretary exercises enforcement discretion to notify an alien of the agency's decision to forebear from seeking the alien's removal for a designated period of time. However, USCIS does not enforce orders of removal, thus to better align USCIS with its mission of administering our nation's lawful immigration system.

On August 7th, USCIS determined that its field offices would no longer accept nonmilitary requests for deferred action. This redirection of agency resources did not affect DACA, which remains in effect according to the nationwide injunction, while cases go through the court system.

It also did not affect other deferred action request processes at USCIS service centers under statute, or other policies, regulations or court orders.

On September 2nd, USCIS announced that the agency would reopen previously pending nonmilitary deferred action requests. Further, on September 18th, acting Secretary McAleenan directed USCIS to resume consideration of nonmilitary deferred action requests on a discretionary case-by-case basis, except as otherwise required by an applicable statue, regulation or court order.

The acting secretary further directed USCIS to ensure that the procedure for considering and responding to deferred action requests is consistent throughout USCIS, and that discretionary case-by-case deferred action is granted only based on compelling facts and circumstances.

All cases that were denied around August 7th, 2019 have now been reopened and are being considered, pursuant to the acting secretary's September 18th directive. And that concludes my statement. Thank you.

ALBENCE: Good morning, Chairman Raskin, Ranking Member Roy and distinguished members of the subcommittee. I also want to express my condolences on the passing of Chairman Cummings.

As you know, on September 11th, 2019, ICE testified on this matter before this committee. At the time of that hearing, the ICE witness, the acting executive associate director for Enforcement and Removal Operations, Tim Robbins, stated that he was not aware of anyone at ICE being involved in the decision to end the program.

This document is being prepared for the exclusive use of ████████ at U.S. DEPARTMENT OF HOMELAND SECURITY

He further explained that ICE lacks any program or mechanics to consider affirmative deferred action requests, but described the variety of ways that ICE does utilize its discretion, as appropriate, on a case by case basis, throughout the immigration enforcement process.

Contrary to claims made by this committee and the media about the willingness to answer questions during that hearing, the only questions our witness declined to answer regarded possible future actions being considered by the acting secretary of Homeland Security, and questions related to internal USCIS issues, of which he had no knowledge.

And as the committee is aware, within a few days of the hearing, Acting Secretary McAleenan directed USCIS to resume consideration of nonmilitary deferred action requests on a discretionary case by case basis.

In addition to our previous testimony, ICE provided several responses to several follow-up questions from that hearing to the committee in a letter on September 24th, 2019. In another letter, dated October 15th, 2019, DHS further clarified that ICE had no part in USCIS' previous decision.

So even though ICE's discretionary abilities are not at issue here today, and as USCIS has resumed consideration of these requests, a process in which ICE is not involved, I am here today and prepared to answer questions you may have regarding ICE's role or, more specifically, lack thereof, in this matter.

However, I want to clearly state that I believe this continued repetition of inaccurate information does a tremendous disservice to the dedicated professional men and women of ICE and, just as importantly, it does a disservice to the American public, who deserve transparency and facts regarding the operation of their government.

In a day and age when individuals are committing violent acts on ICE offices and making threats against ICE officers, agents, employees and their families, to continue to suggest that ICE had some role in this process is not only inaccurate, as confirmed by the information already provided to this committee, but also irresponsible.

So I am here today to defend the men and women of ICE, and to once again set the record straight. I look forward to your questions.

RASKIN: Thank you much for your testimony, both of you.

And at this point, having permitted the several members to join the subcommittee in the dais, who wanted to be with us today, Misters Rouda, Cooper and DeSaulnier, we will move to the five-minute questioning portion and I will recognize myself for five minutes first.

Mr. Cuccinelli, threatening to deport sick kids was an appalling thing, and it was public revulsion at this prospect, which assembled us in our first hearing on it. And we were very glad that the administration reversed course and decided not to pursue that policy.


This document is being prepared for the exclusive use of ▇▇▇▇▇▇▇ at
U.S. DEPARTMENT OF HOMELAND SECURITY

But I want to ask you, what exactly is the policy in place for processing these requests now? I understand this compelling facts and circumstances standard that's been enunciated. Do we -- are you considering being in the country for purposes of receiving necessary medical treatment to be a compelling fact and circumstance?

CUCCINELLI: Mr. Chairman, the acting secretary returned us, essentially, to the process we were in before August 7th. And I would note that there is no program. That's part of the challenge here. This is about withholding action, not undertaking a formal process. It's about withholding action, in fact.

And the -- you saw what the acting secretary wrote, with respect to -- his phrase, granted on compelling facts and circumstances. That is the only -- what I'd call substantive commentary that has been distributed to our workforce in terms of reopening these cases and how to process them. Otherwise, everything has continued as it was before.

RASKIN: OK. So as I understand it, there were at least 424 families whose deferred action requests were pending on August 7th. They were denied, that's when they were told to -- that if they didn't leave the country, they should report for possible deportation. But then they were automatically reopened after the reversal of the policy. Can you tell me how many of those requests of those 424 families, have been approved at this point?

CUCCINELLI: I can't relate to the specific 424. Those were ones given notice around August 7th. There were over 700 cases pending at that time.

But we've completed, as of earlier this week and since the reopening, 41 cases was the last number I heard at the beginning of the week. But I have no...

RASKIN: Forty-one cases where people were granted...

CUCCINELLI: No, that's where I was going, Mr. (inaudible).

RASKIN: Oh.

CUCCINELLI: I have no idea whether those 41, how they relate to the 424 who got -- who were among those who got notices on August 7th.

RASKIN: OK. I've got to say, this is an occasion for some frustration because we requested a lot of documents on this, and I think we received one document, which was basically the statement that you had received about compelling facts and circumstances. So we don't know what's going on there. We are cheered that there was a formal reversal of the policy, but -- and I understand that there's no formal program.



This document is being prepared for the exclusive use of ███████████ at U.S. DEPARTMENT OF HOMELAND SECURITY

But there was a policy of allowing people in this situation to stay in the country. Then it appeared there was a reversal of that policy, and that we were going to summon these people, essentially for deportation proceedings. Then there was congressional and public outrage, I think of a bipartisan character. That policy was reversed.

But we want to make sure that what was going to take place on a sweeping and categorical level, is not taking place at a less visible ad hoc level. We want to make sure that the prior policy really is reinstituted. And so is that your sense of what's going to happen with these 424 people? I mean, do we have to have a hearing on each of these cases? I guess that's what I'm asking you.

CUCCINELLI: Well, of course, we don't testify about individual cases. And -- but the -- I understand that you'd like to see more written material, but there -- we gave you, in response to one of the letters, the entire universe of what is written on this topic, and it didn't even cover one side of one page. Because this is a pure process question in terms of how USCIS handles this internally.

You know, for other things, standards are laid out, they're discussed, they're -- but we don't have a law here. We don't have a regulation. This isn't taking action, it's withholding action.

And so beyond the secretary's statement about grants only on compelling facts and circumstances, which I can't even compare to anything before August 7th because no equivalent existed before August 7th, that's the only -- that's the only item that has been added to the -- to the materials or information that an adjudicating officer might reference.

RASKIN: And the way I would treat that is that the policy before was that cases of people being in the country to receive medical treatment established a compelling reason to be here. And these are all compelling facts and circumstances. That's certainly the way that I would understand it, it's the way that I'm interpreting it.

I think I speak for a lot of my colleagues in saying that we would not want this to be the occasion for the creation of a new bureaucratic narrowing of the possibilities for people to be in the country to continue the medical treatment that they were here to get.

Let me -- well, my time is up. And I'm going to go ahead and recognize Ms. Maloney. But we'll come back around because we definitely have some more details that we want to get out of this situation. Thank you.

And, Ms. Maloney, you're recognized for five minutes. Or -- are you ready (ph)?

(UNKNOWN): (OFF-MIKE)

RASKIN: Oh, OK. Then I will recognize Mr. Roy or -- oh, OK. And we'll pass it down.

KELLER: Thank you, Mr. Chairman.



This document is being prepared for the exclusive use of ██████████ at U.S. DEPARTMENT OF HOMELAND SECURITY

And thank you, gentlemen, for being here today. It is certainly a sensitive issue, when we're talking about individuals that have medical problems. And it's always -- we always want to make sure that we handle things properly. So I just want to make sure that, for the record, everything's straight.

We're talking about deferred action, which means we're deferring taking action against people that may or may not be in the country here, or overstaying a visa, or something like that. Is that correct?

CUCCINELLI: Well, they are here illegally. That's the request for the deferred action.

KELLER: OK. So it's a request for deferred action. And the rules currently under the law, you are just enforcing the law that's currently on the books?

CUCCINELLI: That's correct.

KELLER: OK. You're not making -- you're not making law or anything else, you're just enforcing what's on the books?

CUCCINELLI: That's correct.

KELLER: So when people received letters that said, if you're not in the country legally, you need to -- you need to show up or you may -- did the letter say "may be," action may be taken?

CUCCINELLI: That's right.

KELLER: So the word "may" was in there.

CUCCINELLI: It is.

KELLER: OK. So it wasn't saying this was actually going to happen, it was going to say this may happen.

CUCCINELLI: Correct. At the end of that time period. And they were form letters, adopted from other usage in the agency. It is pretty standard language. And at the end of that time period, adjudicating officers would then revisit the case about issuing an NTA or not.

KELLER: So in other words, if I was a person who would have gotten one of those letters, I could have shown up and made my case, and I wouldn't have necessarily been forced to leave the country?

CUCCINELLI: Well, I mean, it could be the case that the NTA is not issued. But, you know, we -- of course, we never really reached that point in this process with the -- with the initial August 7th shutdown of this process, because it was reopened less than a month later.

KELLER: OK. But, again, I don't think it was any person's intent to make people leave that had a medical problem, it was just making sure that the people that were here actually had -- had a decision made to let them stay, by the U.S. government.



This document is being prepared for the exclusive use of ▮▮▮▮▮▮▮▮ at
U.S. DEPARTMENT OF HOMELAND SECURITY

CUCCINELLI: Well, it would have taken USCIS out of the prosecutorial role of exercising prosecutorial discretion, which is what deferred action is. It would not have replaced it with anything else. And it is -- and, you know, had it rolled forward, then it would have been considered in the normal course, following on those letters.

KELLER: OK. So in other words, what really needs to happen is, we as -- we as Congress should set up some kind of law -- I mean, I keep hearing (ph) program and everything else, it's not really a program. It's just the fact that we're not taking action on something that we should be.

CUCCINELLI: Right. That's absolutely correct. And, I mean, there is an equivalent in the State Department context. There's B2 visa, people can come visit temporarily for medical purposes. They have a whole process set up for that. It is temporary. And -- and that's established pursuant to law, passed by Congress.

CUCCINELLI: What we're talking about today is not -- is not based on law, it's not based on regulation. It is -- it is much like the executive creating law by deciding how to use deferred action, an inherent prosecutorial -- prosecutorial authority, to achieve a goal.

And if there's a goal on which Congress agrees should be achieved, and they pass a law to it, I promise you, we'll -- we'll implement that law.

KELLER: OK. OK, and I think that's an important distinction, that you're not trying to do anything other than enforce the laws of our nation, and if we as Congress think that -- that that law needs to be changed and we make the -- the changes, you will abide by the changes.

CUCCINELLI: Absolutely.

KELLER: OK.

CUCCINELLI: Absolutely.

KELLER: And -- and again, when we're doing a discretionary case-by-case scenario, I think that -- that doesn't lead to any certainty for the people trying to enforce our law or for the people that need to come here and get treatment.

CUCCINELLI: Well, it is not -- even deferred action is not durable. It can be revoked at any time and I mean, it isn't an immigration status. So it -- it is -- it -- because it doesn't have a legal foundation, it is a very uncertain course for people to be on.



This document is being prepared for the exclusive use of ███████ at U.S. DEPARTMENT OF HOMELAND SECURITY

KELLER: Yeah, I mean, deferred action, I mean, we can defer many things and it doesn't -- it doesn't necessarily make them legal. And -- and I guess that's the point I want to say. I could -- we -- we could decide we want to not enforce IRS law and not collect taxes from a certain amount of people and defer their taxes. That doesn't mean they still don't owe it. It doesn't mean they're following the law. And I guess the point I would say for this committee, rather than -- rather than replowing the ground that we've already plowed, the decision has been changed, I would suggest that we give the administration and the individuals trying to enforce our law the tools they need, and Congress act on this, rather than wasting time on other things.

And I yield back. Thank you.

RASKIN: Thank you, Mr. Keller.

I now recognize Ms. Kelly, the gentlelady from Illinois, for her five minutes of questioning.

KELLY: Thank you, Mr. Chair.

Mr. Albence, I want to understand ICE's role in this process. USCIS didn't notify the public about this disastrous decision they made in August. To add to the confusion, once the public found out through media reports, USCIS claimed that ICE would be handling medical deferred action requests going forward. At that time, ICE said it was never even informed of this handoff. According to press reports, ICE was, quote, "blindsided" by the move from USCIS and ICE was, quote, "scrambling to respond." Mr. Albence, was that true? Were you blindsided?

ALBENCE: Yes, as -- as we've put in writing back to the committee, there were some discussions, you know, over the years with regard to this process. But the ultimate decision and anything contemporaneous with that decision was made by CIS.

KELLY: And when and how did you find out about the decision?

ALBENCE: I want to say that my chief of staff or public -- public affairs brought it to my attention.

KELLY: And when was that?

ALBENCE: I don't have the exact date. It's going to be when it hit the media. It would have been the day that we put out that statement, so I think that maybe the 25th or 27th of August, but I'm not exaccurate -- exactly sure.

KELLY: So that was the first time you learned that USCIS was telling the press that ICE would be taking over deferring action requests?

ALBENCE: As I believe so, yes.

KELLY: OK.

© 2019 BGOV LLC All Rights Reserved



This document is being prepared for the exclusive use of ████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

I find this language -- discretionary, case by case basis -- what does this mean? Can you get back in writing to me, how does USCIS define it? My time is up, but I'd like to see in writing how you define this exactly, for the purpose of...

CUCCINELLI: We do not. That's the answer. And I know you all don't like that answer. This is not an action, a program or policy. It is the withholding of action.

Madam Chairman, you just described what might make an excellent individual standard in a piece of legislation, people coming here and doing scientific studies and getting medical care, sounds to me like it would make an excellent piece of legislation. We don't have that, we don't have that.

MALONEY: Simply put -- simply put, one last question. Will we be applying exactly the same standard to deferred action, going forward, as the agency used in the past? Yes or no?

CUCCINELLI: We did not explain, we did not pose any standards other than the case by case decision, which then goes up, functionally, to four regional directors, who are career employees, and they talk to one another, primarily to make sure that they are implementing this process consistently across the country.

But there are no standards we've given them, other than what you see here from the acting secretary, of the language of compelling facts and circumstances. Because we don't have a legal basis to do so. We would welcome that from you all, but...

(CROSSTALK)

MALONEY: Well, have you written guidance? Provided training?

RASKIN: The gentlelady's...

MALONEY: I yield back.

RASKIN: Thank you. The gentlelady's time has expired, so thank you for your answer to that.

There was one question embedded in the gentlelady's thoughtful line of questions, which was, what would your recommendation be to people in this situation? I heard you just say that parents will do -- all parents legitimately will do whatever they can for their kids, and I take that to mean that they should continue to stay and -- and have their children...

CUCCINELLI: Well, of course. All of you know I can neither give them legal advice, nor will we sit here at the table in front of you and decide individual cases. And accepting full well how sympathetic the case is, which is exactly why we use the kind of compelling facts and circumstances, language that the secretary did. But if you're looking for me to decide a case here, I cannot do that, and I believe you all know I cannot do that.

RASKIN: OK, thank you.

This document is being prepared for the exclusive use of ████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

I am now pleased to recognize our distinguished colleague from Massachusetts, Ms. Pressley, for her five minutes of questioning.

PRESSLEY: Thank you very much, Mr. Chairman.

This hearing has been a long time coming, and there was some commentary from my colleague across the aisle saying that we have better things to work on, and should not be wasting our time. I never want us to lose sight of the impact on real people's lives when we are talking about policy, and that is, in fact, why the American people sent us here, so we are not wasting our time.

Gentlemen, it is disappointing that it took the threats of subpoenas to bring you before our committee today. In a moment, I will turn more to your actions, but first, I want to say to the families that have been impacted by this egregious policy shift. Families like my constituents, the Sanchez (ph) family, and Serena Ebenez (ph) and her mom, Conchita (ph). I told them when I met them that I would fight for their children as if they were my own, and I intend to honor that.

Sixteen-year-old Jonathan Braley (ph) came before this committee and shared his story. He spoke of how cystic fibrosis has ravaged his body, and in fact, the tragic death of his younger sister in Honduras, who suffered similarly. The reckless actions of your agency that have put his variability to receive life-preserving medical care at risk are just unconscionable.

For 88 -- 83 days, Mr. Chairman, nearly three months now, we have been demanding answers out of this administration.

Mr. Cuccinelli, you testified that you understand that we want more paperwork, but you simply don't have it. None of us here -- we're in government. We don't want more paperwork, but what we do want are real answers and justice for these families and a piece of mind, and they deserve that, and their children deserve that. And so for nearly three months we have been demanding answers out of this administration for its horrendous and callous efforts to deport our critically-ill immigrant neighbors and their families. And while I am relieved that the policy has been reversed, these families and the American people deserve answers. They deserve the certainty that they will be able to remain in this country.

So I'd like to thank the brave families like these and countless others who, despite the traumatic and imminent fear of deportation and having to fight a life-threatening illness, stepped up and spoke out to shine a light on this injustice, as well as the attorneys and the advocacy organizations.

I'd also, I'd like to request unanimous consent to include statements for the record from the Lawyers Committee for Civil Rights in Boston, as well as the American Immigrant Lawyers Association.

RASKIN: Without objection, they'll be entered to the record.

PRESSLEY: Thank you.



This document is being prepared for the exclusive use of ████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

Now gentlemen, your agencies have still failed to turn over a single document in response to our letter, and even response to the subpoenas that our forever-chairman, may he rest in power, Elijah Cummings, signed in his last official act before his transition. It's shameful, but consistent, so I hope that you can answer the questions that I have.

USCIS and ICE have continuously refused to identify who made the decision to end consideration of deferred action at USCIS. I can only assume it is because no one wants to put their name on such a disastrous, cruel and un-American policy, and the government officials who made that decision ought to be held to account.

Mr. Cuccinelli, I remind you that you are under oath before us today. Who made the decision that USCIS would stop accepting and processing deferred action requests on August 7th?

CUCCINELLI: That was my decision as the acting director.

PRESSLEY: OK, very good. And you stand behind that decision?

CUCCINELLI: That decision's been reversed.

PRESSLEY: The reversal, yes. OK. But today, those families have received no notification confirming the reversal of that. Can you tell me why that is?

CUCCINELLI: I think they have. We are a -- a paper agency, when it comes to matters like this. So when cases are closed, literally a physical file is wrapped up and mailed to a storage facility, and so when we reopen the cases...

PRESSLEY: I'm sorry.

CUCCINELLI: ... we literally have to...

PRESSLEY: I'm sorry. I'm running out of time. I apologize. After we...

CUCCINELLI: I'm just trying to answer the question.

PRESSLEY: No, I apologize, sir. I just -- I have to reclaim my time, so Mr. Cuccinelli, would it be fair to say then that you were not aware of some of the most consequential decisions and policies coming out of your agency, since initially you said you did not know that it was coming?

CUCCINELLI: I did not say that today.

PRESSLEY: Earlier today in your testimony, OK. Yes or no, Mr. Cuccinelli, did anyone at the White House play a role in this decision?

CUCCINELLI: This was an agency decision solely, and other than discussion within the Department of Homeland Security...

PRESSLEY: So reclaiming. I'm sorry. Did Stephen Miller play a role in this decision or not?



This document is being prepared for the exclusive use of ███████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

CUCCINELLI: So I'm not going to get into specific commentary back and forth, but I made this decision. The only discussions had over the course of the...

PRESSLEY: So I'm sorry. Again, for the record...

CUCCINELLI: ... over the course -- over the -- yes, this is for the record.

PRESSLEY: Mr. Cuccinelli, I understand.

CUCCINELLI: ... and as you noted, I'm under oath, so I'm going to be completely truthful...

PRESSLEY: Yes, you are under oath, so I -- I...

CUCCINELLI: ... and I can't do that if I can't be complete.

PRESSLEY: ... so then this is very easy to answer. So yes or no...

CUCCINELLI: I'm not going to just answer the way you want me to answer. I'm going to give you an honest and accurate answer.

PRESSLEY: No, no, I'm asking you to answer yes or no. Was the president involved in this decision?

CUCCINELLI: We cannot, as you well know, talk about content of decision -- discussions with the White House.

PRESSLEY: I'm sorry, but you just said that you made the decision.

CUCCINELLI: Yes.

PRESSLEY: OK. So was the president involved, yes or no? That should be simple.

CUCCINELLI: I made this decision alone.

PRESSLEY: Was Stephen Miller...

RASKIN: The gentlelady's time is expired. Thank you very much, and we will go now to Ms. Miller.

MILLER: Thank you, Chairman Raskin.

RASKIN: Ms. Miller, you're recognized for five minutes.

MILLER: Thank you.

We have a crisis on our border. This year to date, we have had over 850,000 total apprehensions on our southern border. I commend and thank President Trump for stepping up and taking action, while my colleagues across the aisle have refused to appropriately and adequately address this crisis.

During our last hearing on this topic, I posed a question to Mr. Homan regarding all of the rhetoric surrounding the crisis at our southern border, and now I want to propose it and pose it to you.

Director Cuccinelli, and Director Albence, has all of this rhetoric helped move the ball forward on solving our nation's larger immigration issues?



This document is being prepared for the exclusive use of ███████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

DESAULNIER: Let me ask you a few more questions. Did you approve this policy without even bothering to figure out how you would implement it?

CUCCINELLI: No.

DESAULNIER: No, you did not. So what was your plan to notify people requesting deferred action, the general public, if they knew that you -- U.S. -- USCIS would stop considering deferred action requests?

CUCCINELLI: Oh, as you noted earlier, our plan was to notify them one at a time, individually and directly.

DESAULNIER: That was the plan. So you had no plan, but you did? Didn't you just...

CUCCINELLI: That was the plan.

DESAULNIER: Just to notify them?

CUCCINELLI: Yes.

DESAULNIER: But -- but then you also stated that the -- the function would be transferred over to...

CUCCINELLI: No, no, no, no, no, no.

DESAULNIER: ... ICE.

CUCCINELLI: No sir. No, that is a dramatic mischaracterization, and I think it's how ICE got dragged into this in the first place. There was never any suggestion anywhere by anyone that we were going to transfer some affirmative application process for deferred action over to ICE. That has never, ever been the case.

DESAULNIER: But Mr. Albence just testified that he was -- he was first notified it by a public affairs officer that learned about it through the press. That was not correct?

CUCCINELLI: But "it" is not transferring this to ICE. ICE has their own discretionary authority, which Mr. Albence described. We were, to put it in simple terms, ceasing the use of this discretionary authority...

DESAULNIER: So...

CUCCINELLI: ... which dates all the way back to INS.

DESAULNIER: When you decided to reverse the policy, why didn't you choose to issue a new, like a news alert, a public release, something that said that was being reversed?

RASKIN: Gentleman's time is expired. You may answer the question.

CUCCINELLI: Yeah, if -- if you're referring to the secretary's reversal, we did do that.

DESAULNIER: On the -- regarding September's...

RASKIN: He's referring to the initial policy.



This document is being prepared for the exclusive use of ████████ at U.S. DEPARTMENT OF HOMELAND SECURITY

CUCCINELLI: Well, he's -- I thought I heard reversal.

DESAULNIER: Your full policy reversal on September 18th?

CUCCINELLI: Yes, sir. That was publicly announced.

DESAULNIER: OK, I don't have that.

RASKIN: OK. The gentleman's time is expired. We'll come to...

DESAULNIER: Thank you so much.

RASKIN: Thank you.

We'll come to Mr. Roy for five minutes of questioning.

ROY: Thank you, Mr. Chairman.

Mr. Albence, it is -- falls under ICE for removal proceedings, correct?

ALBENCE: That's correct.

ROY: Mr. Cuccinelli, let me ask you a question. Has Congress, this august body, created a status for individuals who overstay visa or come here illegally?

CUCCINELLI: No.

ROY: Is there a law directing USCIS to give status to any of the individuals we're talking about here today that Congress has made clear and -- and put into law?

CUCCINELLI: No.

ROY: My colleagues mention a compelling reason to be here as a standard of some sort. Is that a visa category?

CUCCINELLI: No, and it's very difficult to -- to talk about -- at a policy level about how it would affect any particular case, because by definition, it's case-by-case.

ROY: Is it a status?

CUCCINELLI: No.

ROY: Is it as a human being, as a Christian, or as someone of faith or of, you know, looking at someone through the eyes of a human being, something that's concerning, a compelling reason to be here, somebody who's (inaudible)

CUCCINELLI: Sure. Absolutely.

ROY: Is anything in the letter that was sent on August, whatever it was, 7th factually untrue?

CUCCINELLI: No.

ROY: Was it legally correct?



This document is being prepared for the exclusive use of ███████████ at U.S. DEPARTMENT OF HOMELAND SECURITY

CUCCINELLI: Yes.

ROY: Might people quibble over tone...

CUCCINELLI: Oh, sure.

ROY: ... but it was factually correct?

CUCCINELLI: Sure.

ROY: Now, you said you made a -- a decision to change procedures.

CUCCINELLI: Yes.

ROY: My perception of the procedure, so I can try to figure out the policy, which is what Congress should theoretically be in the job of doing -- if one overstays their visa or comes here illegally and you face a health issue and you're getting care in the process that you were here, you had status, you were here illegally or you were (inaudible), you know, you had status, you were getting care and now you're overstaying your visa, and the process really is essentially to go to USCIS and to beg for some sort of intermittent two-year deferral from an entity, USCIS, without it being really rooted in any law that Congress has put forward, and to seek deferred action from, in essence, ICE by way of a UI -- USCIS letter, when USCIS doesn't actually prosecute, and therefore, you're effectively leaving these individuals in limbo. Do I have roughly the characterization correct?

CUCCINELLI: Yes, and it might help people to understand, the reason I said this goes back to INS days. Back in INS, the same person as a regional director had the prosecutorial authority that ICE now manages and the USCIS authority at the same time. That was all in one person. When INS was broken up, in the initial distribution of authorities, this was just given to the three agencies, and I don't think with much consideration of what's the difference between CBP, ICE and USCIS, as it relates to something like we're talking about.

ROY: So in -- in trying to clarify the procedures, were you -- can you clarify why you are trying to clarify those procedures?

CUCCINELLI: So several years ago the -- the president indicated publicly that he wanted us to stop utilizing, essentially expanding the law to provide benefits that aren't provided by Congress or by regulation, and that's been a ongoing process at USCIS. There are lots of little things that have already taken place, all publicly known. This is along those lines, which is why I understand, Francis Cissna, then the director, all the way back to the end of 2017, in conversations with field leadership determined that this was one of those types of, just descriptively, authorities, and to start working to back out of utilizing that authority because it wasn't appropriate for USCIS's mission.



This document is being prepared for the exclusive use of ████████ at U.S. DEPARTMENT OF HOMELAND SECURITY

ROY: And isn't this at the core of the question here, right? I mean, on so many levels, I get frustrated that Congress doesn't act. I get frustrated that Congress doesn't act with respect to the authorization of the use of military force. Eighteen years after we passed the first one in 2001, we have men and women enlisting into the military who weren't alive when we passed that authorization of force.

In the spring I introduced legislation called the Article 1 Act that would have national emergency declarations expire after year. I happen to believe that regardless of who's in the White House, Congress should reclaim its authority. Congress should act. Congress should do what we're supposed to do, which is pass laws, and then hold you all accountable for carrying out those laws. And it -- it strikes me that part of the problem we have here in this case, but also with things like DACA and DAPA, right? So let's, you know, in terms of whoever is in the White House -- doesn't matter to me -- like, let's have clarity in the law. But let's not expect bureaucrats -- respectfully -- those in the agencies, to be making policies on the margins of the law that Congress passes.

So if we have -- in the case of DAPA and DACA, which, when I was in the first assistant attorney general of Texas, we litigated, then went to the United States Supreme Court, the question was whether or not conferring status and benefits to a class of individuals is something you could plausibly say is actually prosecutorial discretion.

And it's ridiculous for Congress to be building a policy on the back of asking bureaucrats to make those decisions when we hold the pen and we could decide what laws we want to put in place.

(CROSSTALK)

ROY: Would you agree with that? And then I'll -- I'll...

(CROSSTALK)

CUCCINELLI: But you're not -- yes, you're not building a policy, you're telling us to implement a policy. You're not giving us standards, you're asking us for standards that don't exist in law. And as I said earlier, pass a law. I promise you, we will implement it.

RASKIN: All right. And then the gentleman's time has expired. I want to thank Mr. Roy for his thoughtful comments. I want to -- I do want to say I concur with a lot of your sentiments about Article I and the exercise of congressional power.

On the DACA question, the House of Representatives has passed the DREAM Act, and it is over in the Senate, so we're waiting for Senate action. So it takes two to tango here in the United States Congress. It's not just the House side, it's the Senate as well in order to have effective Article I action.

All right. With that, I will recognize Ms. Wasserman Schultz for her five minutes of questioning.

WASSERMAN SCHULTZ: Thank you, Mr. Chairman.



This document is being prepared for the exclusive use of ████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

WASSERMAN SCHULTZ: OK. But you have implemented a policy that yanks social services and denies the ability of children...

CUCCINELLI: It denies nothing.

WASSERMAN SCHULTZ: ... legal status to immigrate here if they are going to use social services. In fact, advocates have reported that immigrant families are terrified and that some have already dropped their children from essential programs like Medicaid and Temporary Assistance for Needy Families.

When you announced this rule, you were asked whether it was consistent with the poem under the Statue of Liberty, which reads, quote, "Give me your tired, your poor, your huddled masses, yearning to breathe free." And in response, you said the poem was only referring to people coming from Europe. And people coming from Europe would not be a public charge.

Do you think our...

CUCCINELLI: I did not say that.

WASSERMAN SCHULTZ: That is what you said.

CUCCINELLI: That is not what I said.

WASSERMAN SCHULTZ: You think -- oh, well that certainly was the implication, is that...

CUCCINELLI: No, no, no. It's what you would like to broadcast, but that is...

WASSERMAN SCHULTZ: No, no. I heard -- I heard you say it.

CUCCINELLI: ... absolutely inaccurate.

WASSERMAN SCHULTZ: I heard you defend it. And I want to know whether you think our immigration policy should treat immigrants from Europe differently from other immigrants from other parts of the world. And is the...

CUCCINELLI: No.

WASSERMAN SCHULTZ: ... purpose of -- you don't think so?

CUCCINELLI: Correct.

WASSERMAN SCHULTZ: Well, so then I'm not sure why you made that statement because...

(CROSSTALK)

CUCCINELLI: Well, I didn't.

WASSERMAN SCHULTZ: ... certainly made it seem like -- you did. You said the poem...

CUCCINELLI: You -- you appended your own -- your own piece to the end of it.

WASSERMAN SCHULTZ: ... no, no, no. You said the poem was only referring to people coming from Europe. There's no doubt about that. And...



This document is being prepared for the exclusive use of ███████████ at U.S. DEPARTMENT OF HOMELAND SECURITY

CUCCINELLI: You added to the end...

WASSERMAN SCHULTZ: ... and the implication...

CUCCINELLI: .. of that statement.

WASSERMAN SCHULTZ: ... was that people from Europe would not likely to be a public charge. Is this...

CUCCINELLI: No, it was not.

WASSERMAN SCHULTZ: Were you attempting to shut down the American dream for immigrants who may not be rich or white with this policy?

CUCCINELLI: No, obviously.

WASSERMAN SCHULTZ: OK, we are the wealthiest country on earth. Surely we can live up to the spirit of Lady Liberty and open our arms to immigrant families who just want to make a better life for their children, and not yank the rug out from under them, as you have with this heinous public charge policy.

And the intimidation tactics that you've used, to make sure that people understand that they're not welcome here if they're brown or if they need to help.

Thank you...

CUCCINELLI: That's false.

WASSERMAN SCHULTZ: ... I yield back the balance of my time.

CUCCINELLI: That is utterly false.

WASSERMAN SCHULTZ: It is not false, and the time is not yours.

(CROSSTALK)

RASKIN: The gentlelady has yielded back...

WASSERMAN SCHULTZ: The time is not yours.

CUCCINELLI: With the law back to 1645...

WASSERMAN SCHULTZ: Thank you, I yield back the balance of my time...

RASKIN: The lady has yielded back her time.

WASSERMAN SCHULTZ: ... and the witness does not have the floor.

RASKIN: The -- I will now recognize Mr. Clay, the gentleman from Missouri, for his five minutes of questioning.

CLAY: Thank you, Mr. Chair. And thank you for conducing this hearing.



This document is being prepared for the exclusive use of ████████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

And the Americans Academy of Pediatrics or AAP represents over 67,000 pediatricians across the country. After USCIS decided to deport critically ill children, AAP wrote a letter to you, Acting Director Cuccinelli, and to Acting DHS Secretary Kevin McAleenan about the decision.

AAP wrote -- and I quote -- "We implore you to reverse this decision so that countless children and their families can continue to apply for deferred action. For some children, this is a matter of life and death."

Mr. Cuccinelli, have you read that letter? Turn on your mike for me, please.

This subcommittee received 15 more letters from state chapters of the American Academy of Pediatrics in advance of our hearing in September. These letters include truly heartbreaking stories of children and families, thrown into fear for their lives because of this situation.

Doctors in Massachusetts reported that the family of a 10-year-old who has -- had been blinded by eye cancer had been ordered to leave the country, along with the family of a 7-year-old suffering from severe epilepsy.

==Mr. Cuccinelli, did you know about either of those -- these cases when USCIS decided to end deferred action?==

==CUCCINELLI: Congressman, we don't read individual cases when making a procedural decision like that. So the answer to your question is no.==

CLAY: Did you think about maybe these kids needed some life-saving medical attention...

CUCCINELLI: Well...

CLAY: ... if they could get here in this country?

CUCCINELLI: Well, Congressman, we knew that as a practical matter, they had come to us seeking deferred action affirmatively. They weren't in removal proceedings. None of the cases we've talked about before USCIS were in removal proceedings. None were threatened with deportation. I have heard ICE people say that they were not on -- you know, none of these people would be on any targeted list. So when we withdrew from the exercise of deferred action in these circumstances, we knew...

CLAY: OK.

CUCCINELLI: ... that deferred action continued to be available to every single one of these sympathetic families.



This document is being prepared for the exclusive use of ███████ at U.S. DEPARTMENT OF HOMELAND SECURITY

CLAY: OK. OK, listen to this: Pediatricians in Indiana reported that parents of at least two infants in a neonatal intensive care unit received letters from USCIS telling them to leave the country within 33 days. Imagine that. You have just had a child that is so sick she is in NICU. At the moment your child's health should be the only thing you have to worry about, the U.S. government orders you to pack up and leave the country. Mr. Cuccinelli, did you know about these cases before USCIS decided to end deferred action?

CUCCINELLI: Yeah, my answer is the same as the earlier examples, sir.

CLAY: Which is?

CUCCINELLI: We do not look at particular cases when making processes.

CLAY: So you don't care.

CUCCINELLI: No, you asked me did I know.

CLAY: You -- no, I'm asking.

CUCCINELLI: You bet I care.

CLAY: Do you care that...

CUCCINELLI: You bet I care.

CLAY: ... somebody's in a...

CUCCINELLI: You bet I do.

CLAY: ... an NA...

CUCCINELLI: And it would be great if we could take care of this...

CLAY: ... a neonatal intensive care unit about to die...

CUCCINELLI: ... if we had a law, if you cared enough to pass a law, we'd enforce it.

CLAY: Let me ask you this: What would you recommend those parents do when they receive that letter?

CUCCINELLI: Well, what most of...

CLAY: What should they do?

CUCCINELLI: ... what -- what we expected most of them to do was very little, candidly. We send a lot of those letters out and not in circumstances like you're talking about.

CLAY: What do you expect them to do? You want to leave the country, pack up their stuff, take their sick child and go?

CUCCINELLI: Either that or make their case in the immigration process where it's appropriate to do so to stay, to stay.



This document is being prepared for the exclusive use of ▮▮▮▮▮▮▮▮ at U.S. DEPARTMENT OF HOMELAND SECURITY

NORTON: But there was a category.

CUCCINELLI: No, ma'am. And there was no medical deferred action. You've sort of implied in your comment that this was just about people seeking medical concerns. And...

NORTON: Sick children, sick children.

CUCCINELLI: ... well, they are among...

NORTON: We are interested in the sick children.

CUCCINELLI: ... they are among those. We also get ADHD filings, and we have filings for people who are getting older, and that's their basis for the claim.

NORTON: So you -- so...

CUCCINELLI: So...

NORTON: ... so you don't -- there was no directive whatsoever to reverse the policy to case by case, and we did not understand the policy to be anything -- to be case by case before. So you're telling us it's always been case by case?

CUCCINELLI: Yes.

NORTON: That's your testimony?

CUCCINELLI: Yes.

NORTON: Obviously, you have to look at every case. But we're looking at the category of sick children. I -- I want to -- I'm asking you because of a decision that directly conflicts with the recommendation your agency reportedly prepared for the acting secretary, just 10 days prior to reversal.

==And I'm referring to a memo that was apparently prepared by your Policy and Strategy chief for a September 9th meeting with Secretary McAleenan. You were selected to lead that meeting. Are you familiar with that memo?==

==CUCCINELLI: I don't have it memorized, but I am familiar with what you're referring to.==

NORTON: The USCIS has not produced that memo for us. But the press reports indicated that the memo recommended that the secretary revoke USCIS authority to grant requests for deferred action.

Reportedly, it said -- and here is the quote from the memo -- "runs counter to the president's agenda to enforce our existing laws, and potentially contrary to his goal of making sure aliens are self-sufficient, self-sufficient," end quote.

Mr. Cuccinelli, did you direct your Policy and Strategy chief to send that memo that I just quoted from?

==CUCCINELLI: Well, we certainly did send a memo with recommendations to the secretary before he made his ultimate decision. It included six or seven, as I recall, different alternatives.==



This document is being prepared for the exclusive use of ███████ at U.S. DEPARTMENT OF HOMELAND SECURITY

NORTON: Did you agree with that recommendation, that the authority of USCIS to grant deferred action requests, should be revoked? Particularly I'm interested, even as to these sick children.

CUCCINELLI: It was a broader comment that the -- with the breakup of INS, this authority was appropriate for the prosecutorial arms of the Department of Homeland Security, not...

NORTON: So you did not push back, even with respect to sick children?

CUCCINELLI: ... not (ph) -- and not appropriate for USCIS. So it wasn't -- we didn't -- it wasn't just related to this category. And of course, you mentioned sick children, which I and I'm sure everyone else at USCIS are very sympathetic to, but that is a category. That is exactly the kind of thing we would look for in legislation, is a category.

We do not have the power or authority to create a categorical grant of a benefit.

NORTON: Mr. Chairman, I just want to indicate that of course there is administrative authority to crate categories. But if they need legislation, maybe we need to tell them what they already know. I thank you very much, Mr. Chairman.

RASKIN: The gentlelady yields back.

And perhaps you could pursue this with Ms. Norton, who is the chair of the EOC so she knows administrative law and policy very well. But it's an interesting conversation.

Let's see. We come now to Mr. DeSaulnier. He is recognized for five minutes of his questioning.

DESAULNIER: Thank you, Mr. Chairman.

Mr. Cuccinelli, it's a little difficult for me to sit here and listen to you say it's the Congress' responsibility when this administration has -- and the president has publicly said that the Second Article of the Constitution tells -- gives him the authority to do whatever he wants.

And the amount of discretion that you have tried to -- the administration, I should say -- in this field, have been challenged in court. The courts have, so far, upheld things like funding of the -- of the border wall, separation of children.

So you're an attorney. I assume you believe in precedent. Deferred action started in the early '70s, I was told in the Nixon administration. There's been iterations all along, allowing for discretion, administrative discretion. And now, suddenly, you say the Congress needs to act.

And I would like, as I said at the last hearing, the historical perspective, at least in the last five sessions, Senate Bill 744, the so-called Gang of Eight bill -- four Republicans, four Democrats -- passed out of the House with bipartisan support, led by Senator Schumer and Durbin and McCain and Rubio.



This document is being prepared for the exclusive use of ████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

ROY: I think my friend from Texas, I would have been in the skiff (ph) but we've had competing circumstances here. So I would just ask a couple of quick questions. Mr. Cuccinelli, we've heard -- I've heard a few of my colleagues on the other side of the aisle, particularly my colleague from New York talk about benefits.

Can you clarify for the record here, whether or not there is or is not a benefit being conferred, or are we talking about in essence, a discretion, a prosecutorial discretion choice as to how we handle these cases?

CUCCINELLI: Well it is -- deferred action is a prosecutorial discretion --

ROY: Right.

CUCCINELLI: And we are not a prosecuting agency. The closest thing to that is simply issuing an NTA (ph) that starts a process, that puts you in to the prosecutorial process. We do not participate in that, that's where deferred action has historically existed and been appropriated.

And frankly, it's inherent in that authority. It is not inherent in our authority at USCIS.

ROY: Right, also can you -- you touched on this a little bit ago, the cost of adjudicating DACA applications, applications like we're talking about here, these deferred actions, not just DACA (inaudible) but these deferred action cases that -- the cost of adjudicating those and what that means in terms of diverting resources from naturalization applications. You mentioned that before, can you reiterate how important that is in the decision making in a world of limited resources?

CUCCINELLI: Yeah, and I didn't mean to suggest that the people doing this would automatically spend 100 percent of that time on naturalizations, I was just trying to give the Subcommittee a point of reference. And Congresswoman, correctly alluded to the fact that there are trade offs, there are -- if we're doing this we're not doing something else. And we, like any other agency struggle to keep up with our workload.

But unlike most agencies of the federal government, we are 96 plus percent fee funded by the -- by part of the immigrant community we serve and we have to operate on what amounts to a balanced budget function year to year. So we don't have the opportunity to come financial flex to absorb more work that hasn't been assigned by Congress or by law, or regulation in some way.

ROY: One more clarifying question, and then I want to yield back to my colleague from Texas. One of my colleagues referenced something about people who were here legally getting wrapped in to this. And I just want to clarify for the record that that that is not the case, correct? I mean, we go back to the letter in question in August -- all that has been -- all that was attempting to be done was noticing folks who were here who did not have status --

CUCCINELLI: Right.



This document is being prepared for the exclusive use of ███████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

CUCCINELLI: I would not do anything contrary to the law. If I understood something to be contrary to the law, I wouldn't do it.

PRESSLEY: All right, very good. If President Trump chooses either of you to replace Acting Secretary McAleenan, will you commit to keeping deferred action protections in place at USCIS? And this is for both Mr. Cuccinelli and Mr. Albence.

CUCCINELLI: I don't think it's appropriate to comment forward like that. I told you already - just here what I would characterize as the - I'll call it a mistake, because it was, to apply this retroactively in particular. I do think the underlying philosophy was correct, and I also understand the deferred action that remains available for all the people, even had the USCIS policy gone forward. But I cannot tell you going forward what I would advise some other secretary to do or what they would do or even if I were the secretary...

PRESSLEY: Well, that's disappointing because...

CUCCINELLI: ... because this is - I understand, ma'am.

PRESSLEY: Mr. Cuccinelli, you've accepted - respectively, you have accepted responsibility for making this egregious policy reversal. You have also expressed regret. And just now you used the word mistake. And so, I'm not sure why it is challenging for you to just offer if you are the Acting Secretary would you keep the deferred action protections in place at USCIS?

CUCCINELLI: I don't expect to see any change regardless of who the secretary is unless the program itself changes (inaudible)...

PRESSLEY: Reclaiming my time. Mr. Albence, your response?

ALBENCE: I mean, first I don't think there's any reason to speculate that I might be the Acting Secretary because I don't see that happening.

PRESSLEY: Would you keep the policy in place, sir? Yes or no?

ALBENCE: I would certainly look at any decision going forward. I support the decision that Acting Secretary McAleenan made.

PRESSLEY: Reclaiming my time, I - in closing, I just want to remind my colleagues here today to not lose sight of why we're here. The families and their critically ill children whose lives are on the line, we've talked a lot about process, but this isn't about process. It's about people, and we should never forget that. Thank you, and I yield.

RASKIN: The gentlelady yields back. Thank you for your comments. Mr. Roy, (inaudible). The gentlemen from Texas, Mr. Cloud, is recognized for five minutes.

CLOUD: Thank you, Chairman. Mr. Cuccinelli, you mentioned you started to get into the lack of resources to do what you are legally mandated to do. Could you speak to that?



This document is being prepared for the exclusive use of ███████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

Because I assume you don't want to be back in the position where she's on the cover of national magazines issues and the New York Times as an example, even though she may be a little bit different. So that's one. And then Ms. Pressley and I are working with the committee, and we're looking for Republicans to work with, to tailor a bill for this group of people that would help them. And in a normal functioning relationship between both parties in -- in Congress and administration, we would be trying to work on something that -- knowing that there'd be give-and-take. So within that context, I hope -- and I would like some kind of response from you that you have the discretion to at least work with us to see if we can provide legislative remedy for this group of people, and specifically for this person.

CUCCINELLI: Well, I don't necessarily agree with your initial comment about precedent in our authority, we will absolutely work with you and -- and I want to make it very clear. We don't even have to agree with what you're doing to be willing to help you do it correctly and craft it correctly. We will do that and bring subject matter experts to help you do that. We would be glad to do that.

DESAULNIER: Well I'm grateful for the help. It sounds a little patronizing but I'll accept that. I mean we'll give you help...

CUCCINELLI: Well no I say it that way simply because the nature of my discussions, people can have the opposite impression. It's not intended to be patronizing at all. It's intended to be to point out that's a function...

DESAULNIER: Accepted. Accepted. That was my Irish sense of humor. So in the process of how all this developed, you issued what came to the letter. You're going to eliminate deferred actions. There was this big public response. We had a, I thought, very bipartisan hearing here and then there was discussion within the administration about what you should do about it.

There's a memo that the presses got a hold of that was given to you by your policy director suggesting that you shouldn't backtrack that you should keep as you originally were going to do. Is that true and do you have it - and did you have an opinion at that time and clearly at time that was after our hearing, you knew about Isabel(ph) and some of these other cases. So did you support the acting secretary's decision to change the policy on deferred action?

CUCCINELLI: Yes, I thought it was particularly critical to get the question decided and as I view our role when advising something like that, we gave him a wide variety of options, presented those to him. With respect to my earlier comments, both to Congresswoman Presley where I noted that I did think it was a mistake to implement this on a retroactive basis. I freely concede that. But philosophically it is appropriate or more appropriate for this authority to rest with the prosecutorial element of the Department of Homeland Security which is not USAIS(ph) and that these folks would still while under different circumstances be able to avail themselves of that.



This document is being prepared for the exclusive use of ███████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY



DESAULNIER: OK, so in this specific case and this is for both of you, they're in limbo. They're in a legal bureaucratic limbo, the boys says dad keeps working and by the way there was no public charge here. They paid for their insurance to be part of the program. They're taxpayers. They're beneficial to the economy and the community. Isabel (ph) went and got a degree with honors from Cal State East Bay, so how do we work to help them through this process until we get to the point where either she can get her deferred action. And they're in this bureaucratic limbo.

CUCCINELLI: Well we - we have as you know reopened these cases and I can't speak to timelines for particular cases but I do know that we have commenced deciding them. I mean we're getting through some of the work and we have seen an uptick in filings I would note for you since this public discussion began. And which that's behind the (inaudible) in that they were already in the pipeline if you will so theirs would not be affected by that uptick but I can't speak to exactly how long it would take for each of the - each of those cases to be decided. I can check it separately when we leave here.

DESAULNIER: In the idea of working together and I would be willing to help you in this regard, not being patronizing hopefully, they're in this situation. It's a practical situation. If we could work to assure them they were going to have their new process as you currently outline it.

CUCCINELLI: Right.

DESAULNIER: And if there's a gap in there we're going to work through it until(ph) a decision making and then if we could work on legislation that would permanently correct at least for this group of people or for her, that's what I would like to hear.

CUCCINELLI: You know we'd be glad to do each one of those things.

DESAULNIER: I appreciate it. I yield back Mr. Chairman.

RASKIN: Thank you very much. The gentleman from Kentucky, Mr. Massie, is recognized for five minutes.

MASSIE: Thank you Mr. Chairman and thank you for having a hearing on this important topic. I want to thank the witnesses for showing up and dispelling the misinformation that's been out in the press and the false narratives that we have heard for the last several weeks and months. Before I yield time to the Ranking Member here, I just want to lament that the full committee - this committee is right now simultaneously conducting a bogus impeachment process three stories underground beneath the Capitol Visitor's Center in a closed room. You have to go through three doors to get there and a lot of my colleagues who would like to be here today are down there both on the democratic side and the republican side.



This document is being prepared for the exclusive use of ███████████ at
U.S. DEPARTMENT OF HOMELAND SECURITY

RASKIN: Got you.

ALBENCE: I cannot say that there is something that could be graded medical deferred action, gets involved in some sort of...

RASKIN: I got you. Somebody could commit a crime while they were here on deferred action for medical reasons. I got you for that.

So but is it your thought, Mr. Cuccinelli, that you would try to elaborate and specify what some of these circumstances are?

CUCCINELLI: No, sir. To be clear from the acting secretary, Secretary McAleenan, it is to continue it as a case-by-case. What we do internally is try -- and I heard some comments a little different than this, is to maintain consistency. And the way we do that is that the four people who are regional directors, sort of at the top of decision chains in the field, talk together about these cases periodically, as they feel the need.

Those are not conversations I am -- I participate in, about cases, to make sure that similarly situated people end up with similar outcomes, whether it's grants or denials. But that is just for consistency. It doesn't introduce any standards or measuring stick, if you will, to provide guidance as to how these may come out. We don't have any basis to do that.

RASKIN: All right. Well, we might have a difference of opinion about that, whether your...

CUCCINELLI: I understand.

RASKIN: ...authority would include that. The only point I would make, and I appreciate what you just said about at least trying to develop consistency. But the point I would make is just, when we say that there is a case-by-case method of decision-making, that just means that each of the facts is treated on their on their own presentation. But there still need to be rules and standards applied for the decision maker to decide how the decision is to be made.

CUCCINELLI: And I think that's the nub --

RASKIN: Yes.

CUCCINELLI: You know.

RASKIN: Well, let me -- OK, let me just shift to another question, and in [ph] my role as chair to the subcommittee -- well we've got to just get on top of the discovery here, which I think we can complete -- we should be able to complete in relative short order, and again -- we feel strongly about this in general because Congress as the lawmaking branch of government has the authority to receive any information we want in order to make the laws that we want to make.

You properly chide us for not having comprehensively overhauled immigration law, but we can only do it if we get the information about everything that we need --